216 N.J. Super. 23 (1987)
522 A.2d 1013
WARREN WASHINGTON, SR., ALMANA WASHINGTON, WARREN WASHINGTON, JR., DOROTHY WASHINGTON, SAMUEL WASHINGTON, SHERROD WASHINGTON AND LINDA WASHINGTON, PLAINTIFFS-RESPONDENTS,
v.
JOSEPH A. MAGAZZU, DEFENDANT-RESPONDENT, AND ESTATE OF JOHN J. WICKER, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 28, 1986.
Decided March 11, 1987.
*24 Before Judges ANTELL, BRODY and D'ANNUNZIO.
Shanley & Fisher, attorneys for appellant Estate of John J. Wicker, Jr. (Lorraine C. Parker on the brief; Susan M. Sharko on the reply brief).
Paul D. McLemore, attorney for respondents Washington.
No brief was filed on behalf of respondent Joseph A. Magazzu.
The opinion of the court was delivered by BRODY, J.A.D.
The question raised in this appeal is whether New Jersey courts may exercise personal jurisdiction over the estate of a Virginia lawyer[1] in a legal malpractice action brought by New Jersey residents. The trial court determined that it had personal jurisdiction and denied the estate's motion to dismiss. We granted leave to appeal and now reverse.
Plaintiffs, residents of New Jersey, engaged defendant Joseph Magazzu, a New Jersey lawyer, to represent them in *25 prosecuting a medical malpractice action against a Virginia medical doctor and a Virginia hospital. Plaintiffs are the surviving members of the immediate family of a young girl who was fatally injured while the family was visiting in Virginia. She had been treated in Virginia by the Virginia medical doctor and died in the Virginia hospital.
For reasons that do not appear in this record, Magazzu wrote to a particular Virginia law firm to inquire whether it would represent plaintiffs in the action. One of the firm's partners wrote back that the firm would not represent plaintiffs but recommended that Magazzu direct his inquiry to John J. Wicker, Jr., whom he described as a "former senior partner who is the only lawyer I know with the forensic ability to handle this case."
The Virginia statutory limitations period expired during the 12-month leisurely correspondence that ensued between Magazzu and Wicker. Wicker wrote Magazzu three letters. In the last, written more than two weeks after the limitations period had expired, he stated that he found no "reasonable basis on which any third party could be successfully sued as defendant." Wicker noted in that letter that when the decedent's parents, plaintiffs Warren Washington, Sr. and Almana Washington, had been to his office shortly before the limitations period had expired they "agreed with me in my opinion."
In Wicker's first letter, he asked for facts concerning the medical malpractice claims and also asked "how much money could (and would) be raised to cover the expenses of litigation (exclusive of attorneys' fees)." Magazzu supplied some facts and assured Wicker that the parents had "accumulated the sum of $1000.00 which could be deposited with you toward expenses."
In his second letter Wicker stated, "However, before any further proceedings, I would like to have a list of the names and addresses of the various parties and witnesses and also a statement of facts on which I could reasonably expect to obtain *26 a plaintiff's judgement [sic]." (Emphasis in original.) Four months before the limitations period expired, Magazzu responded with a letter in which he provided Wicker with additional information and warned him to be mindful of the Virginia statute of limitations. Having responded to Wicker's request, Magazzu may then have reasonably believed that Wicker represented plaintiffs in Virginia.
In his third and final letter, as previously noted, Wicker advised Magazzu that he had told the parents that they had no case.
Wicker's alleged legal malpractice is described in the pro se complaint as follows:
Co-defendant Wicker conspired with Defendant Joseph Maguzu [sic] to permit Plaintiffs Warren Washington Sr. and Almama Washington's proposed time limitations to run.
A generous reading of that unartfully worded claim is that Wicker either undertook to represent plaintiffs and negligently failed to commence the action within the limitations period or negligently gave the impression that he represented them thereby preventing plaintiffs from obtaining other counsel in time to commence the action. We must accept these allegations as true and the claim as valid for the purposes of this appeal because the motion to dismiss was directed solely to the jurisdiction of the court, and not to the merits of the claim. Trustees Structural Steel v. Huber, 136 N.J. Super. 501, 505 (App. Div. 1975), certif. den. 70 N.J. 143 (1976).
Rule 4:4-4, our "long-arm" rule, has been interpreted to permit service of process on a nonresident defendant "to the uttermost limits permitted by the United States Constitution." Avdel Corp. v. Mecure, 58 N.J. 264, 268 (1971). The ultimate question under the Fourteenth Amendment due-process requirement is whether the nonresident has had "minimum contacts with [the forum state] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945) (quoting *27 Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278, 283 (1940)).
Applying that test in a particular case requires a two-step analysis. It must first be decided whether a defendant purposefully established minimum contacts within the forum state so as to have had "fair warning" that a particular activity may subject him to the jurisdiction of a foreign sovereign.
Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there [footnote omitted], this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum ... and the litigation results from alleged injuries that "arise out of or relate to" those activities.... [Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-474, 105 S.Ct. 2174, 2181-2183, 85 L.Ed.2d 528, 540-541 (1985) (citations omitted)]
....
Thus where the defendant "deliberately" has engaged in significant activities within a State ... or has created "continuing obligations" between himself and residents of the forum, ... he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well. [Id., 471 U.S. at 475, 105 S.Ct. at 2184, 85 L.Ed.2d at 543 (citations omitted)]
Wicker's letters directed to Magazzu, the disclosed agent of New Jersey residents, constituted activities by Wicker "purposefully directed ... at residents" of New Jersey and "the litigation results from alleged injuries that arise out of or relate to those activities." Moreover, Wicker's second letter allegedly "created continuing obligations between himself and residents" of New Jersey. Assuming for now the validity of plaintiffs' claim, that letter could be interpreted to mean that if Magazzu supplies certain information Wicker will be plaintiffs' lawyer in the Virginia matter. Magazzu responded with the information and therefore had reason to believe that a relationship involving continuing obligations between plaintiffs and Wicker had thereby been established. We conclude that Wicker purposefully established minimum contacts within New Jersey and thus plaintiffs have successfully negotiated the first step in the analysis.
*28 Wicker directed his New Jersey activities toward being hired by the Washingtons to perform services for them in Virginia. As we will point out in our discussion of the second step, the fact that the object of Wicker's New Jersey contacts was to perform services exclusively in Virginia is a factor that outweighs the ultimate jurisdictional significance of the New Jersey contacts. The New Jersey contacts were nevertheless deliberate and purposeful, not "fortuitous and attenuated" as our concurring colleague concludes, and thereby qualify to satisfy the first step of the analysis.
The second step is described in Burger King as follows:
Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice.".... Thus courts in "appropriate case[s]" may evaluate "the burden on the defendant," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the shared interest of the several States in furthering fundamental substantive social policies. ".... [W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.... Nevertheless, minimum requirements inherent in the concept of "fair play and substantial justice" may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities. [Id., 471 U.S. at 476-478, 105 S.Ct. at 2184, 85 L.Ed.2d at 543-544 (citations omitted)]
We are satisfied that defendant has presented a compelling case that those factors render unreasonable the exercise of jurisdiction over it in New Jersey. It would be a burden on all parties if the dispute were adjudicated in New Jersey rather than in Virginia. Plaintiffs' underlying claims were against a Virginia medical doctor and a Virginia hospital for medical malpractice that allegedly occurred in Virginia. To prove in their legal malpractice action that they sustained damages because Wicker failed to commence the medical malpractice action in Virginia, plaintiffs must try their medical malpractice claims in their legal malpractice action as those claims would have been tried in Virginia under Virginia law. See Lieberman *29 v. Employers Ins. of Wausau, 84 N.J. 325, 342 (1980). It will be convenient to all parties, satisfy both states' interest in an efficient resolution of the controversy, and provide plaintiffs the most effective relief if the action is tried in Virginia where almost all the key witnesses reside, where most of the vital evidence is to be found and where Virginia law and practice can more readily be applied to measure the worth, if any, of plaintiffs' underlying medical malpractice claims.
Virginia has a particular interest in adjudicating a dispute over whether malpractice has been committed by a doctor and hospital that usually treat Virginia citizens. By contrast, even though plaintiffs reside here, New Jersey has an attenuated interest in adjudicating a dispute over the failure of a Virginia lawyer to commence an action in Virginia alleging medical malpractice that occurred in Virginia. The fact that a nonresident lawyer's alleged malpractice affected clients who happen to live in the forum state has not been considered a dominant jurisdictional factor. Reliance Steel Products Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3rd Cir.1982) (Pennsylvania did not have personal jurisdiction over a Missouri lawyer in malpractice action brought by Pennsylvania client for services allegedly performed negligently in Kansas). See also cases collected in Annot., In Personam Jurisdiction, Under Long-Arm Statute, Over Nonresident Attorney in Legal Malpractice Action, 23 A.L.R. 4th 1044 (1983).
A factor that favors jurisdiction in New Jersey in this case is the avoidance of duplicate law suits in New Jersey and in Virginia if plaintiff is unable to obtain jurisdiction over Magazzu in Virginia. We are satisfied, however, that such a prospect is more apparent than real. Magazzu cross-claimed against the Wicker estate for indemnification or contribution. If the estate cannot be sued in New Jersey, it is as much in Magazzu's interest as it is in plaintiffs' interest to have all claims, including his own, adjudicated in Virginia.
*30 In an amendment to his answer, Magazzu recognized the compelling reasons for trying all claims in Virginia where the medical malpractice witnesses and other evidence are to be found. The amendment states in part:
Since the instant matter would equitably involve a "trial within a trial" in the sense that the medical malpractice cause in the State of Virginia would represent a critical aspect of the case, and since all witnesses and evidence thereon would generate from the State of Virginia beyond New Jersey subpoena, the instant matter against this defendant should be dismissed on the doctrine of Forum non Conveniens.
Magazzu had not yet moved to dismiss under the doctrine of forum non conveniens when the estate moved to dismiss on the jurisdictional ground and then took this appeal. By invoking the doctrine in the amendment to his answer, Magazzu demonstrated that he is prepared to submit to the jurisdiction of Virginia. He had to know when he filed the amendment that his follow-up motion to dismiss would be conditioned upon his submitting to Virginia jurisdiction. Civic Southern Factors v. Bonat, 65 N.J. 329, 331, 333-334 (1974); Vargas v. A.H. Bull Steamship Co., 25 N.J. 293, 296 (1957), cert. den. 355 U.S. 958, 78 S.Ct. 545, 2 L.Ed.2d 534 (1958).
Reversed and remanded for further proceedings consistent with this opinion.
D'ANNUNZIO, J.S.C., (temporarily assigned) (concurring).
I agree that requirements of due process preclude the exercise of in personam jurisdiction over defendant Wicker by New Jersey courts and I concur in the reversal of the trial court's decision. However, I perceive no need to reach the second step of the analysis which requires the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985). In my view, Wicker did not purposefully direct his activities at New Jersey residents. Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). Nor did he purposefully avail himself "of the privilege *31 of conducting activities within [New Jersey] thus invoking the benefits and protection of its laws." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958).
Wicker's contact with New Jersey was fortuitous and attenuated. Burger King Corp. v. Rudzewicz, supra. He responded to an unsolicited inquiry from Magazzu, a New Jersey lawyer with whom he had no prior connection. Magazzu was seeking Virginia counsel to prosecute a medical malpractice action in Virginia. Wicker's responsive letter is dated August 18, 1982. In it he requests "a fuller statement of what I would be able to prove if I took the case ..." and inquired of the plaintiffs' ability to cover the expenses of the litigation "exclusive of attorney's fees." Magazzu wrote to Wicker on October 19, 1982 forwarding medical records and providing additional information. He received no reply. Magazzu wrote again on December 22, 1982 to inform Wicker that the plaintiffs had raised $1,000. In this letter, Magazzu asked Wicker if he considered the case "worth pursuing." Wicker's response, dated March 3, 1983, informed Magazzu that "before any further proceedings" he wanted a list of potential witnesses and additional facts. No other letters were written by Wicker prior to the expiration of the Virginia statute of limitation on August 8, 1983. The third letter referred to by my colleague is dated August 26, 1983. In it Wicker informs Magazzu that he met with Mr. and Mrs. Washington in Virginia on August 3rd and 4th and explained to them that, in his opinion, they had no case. Wicker's malpractice, if any, ripened when the limitation period expired, and, therefore, the August 26 letter cannot be a jurisdictional link.
Reliance Steel Products Co. v. Watson, Ess, Marshall and Enggas, 675 F.2d 587 (3 Cir.1982) is similar to the instant case. Defendant, a Missouri law firm, was retained by the plaintiff, a Pennsylvania corporation, to perform legal services for it in Kansas. The court, in affirming the trial court's order dismissing the action, held that an advertisement in Martindale Hubbell Law Directory, a referral from a Philadelphia firm, a *32 telephone call from Reliance to defendant in Missouri retaining the defendant, the delivery of "legal advice in Pennsylvania by telephone" and the billing of Reliance in Pennsylvania did not constitute purposeful availment by the defendant of the privilege of conducting business in Pennsylvania.
Burger King v. Rudzewicz, supra, was decided after Reliance but there is nothing in the Burger King decision which weakens the precedent value of Reliance or which militates in favor of jurisdiction over Wicker or creates the need to engage in the second analytical step of multi-factor evaluation in this case. To the contrary, Burger King confirmed the need for more than fortuitous and attenuated contacts to establish jurisdiction and again asserted the requirement of a defendant's purposeful availment of the privilege of conducting activities in the forum state before he would be subject to that state's jurisdiction. Burger King involved litigation between a franchisor and its Michigan franchisee who were bound to each other by a long term contract.[1] In holding that the franchisee was subject to suit in Florida the court noted that "Rudzewicz established a substantial and continuing relationship with Burger King's Miami headquarters [and] received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida ..."[2]Id., 471 U.S. at 487, 105 S.Ct. at 2190.
Hanson v. Denckla, supra, is formidable precedent which requires reversal without resort to a second step multi-factor analysis. One of the issues was whether Florida could exercise *33 in personam jurisdiction over a Delaware corporate trustee. Subsequent to the establishment of the trust in Delaware, the settlor, who was also the income beneficiary, moved to Florida where she resided for eight years before her death. During these eight years the trustee remitted the trust income to settlor in Florida. In addition, other items of trust administration were conducted by mail between the settlor and the trustee. The Supreme Court ruled that these contacts did not support the exercise of jurisdiction over the trustee because the trustee had not exercised a privilege in Florida. "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 357 U.S. at 254, 78 S.Ct. at 1240.
Clearly and simply, the exchange of correspondence between Magazzu and Wicker, initiated by Magazzu, is not a contact with New Jersey sufficient to support jurisdiction over Wicker.
NOTES
[1] The lawyer, John J. Wicker, Jr., died before plaintiffs commenced this action.
[1] The majority opinion in Burger King rejected the contention that a "contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum ..." 471 U.S. at 478, 105 S.Ct. at 2185.
[2] The franchise agreement provided that "it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida." 471 U.S. at 481, 105 S.Ct. at 2187.