Opinion
 

 PARAS, J.
 

 Transit Casualty Company (Transit), an excess insurer, sued its policyholder, Spink Corporation (Spink), and the primary insurer,
 
 *129
 
 American Motorists Insurance Company (American), for their refusal to settle death and injury claims growing out of a construction site accident. The jury awarded Transit damages of $460,000. Spink and American appeal.
 

 Spink, a Sacramento engineering firm, was the consulting engineer on a construction project owned by Carlson Development Company (Carlson). Spink was insured by a primary professional liability policy issued by American, containing a limit of $100,000 and a $15,000 deductible feature. Spink had also purchased an “umbrella” policy from Transit with $ 1 million limit. Both policies contained a standard provision, which we shall call the “settlement clause,” permitting the policyholder to refuse consent to settlement.
 
 [1]
 

 At the construction site, an unshored trench collapsed. Two employees of a subcontractor were killed and two injured. The heirs of Henry Davis, one of the deceased workmen, brought a suit against Carlson, Spink, the prime contractor, and others. Negligence was claimed because even though safety inspectors had closed the site because of the danger presented by the unshored trench, two subcontractors continued to work on the trench. Plaintiffs charged Spink with negligent supervision of the project.
 

 Carlson filed a cross-action against Spink, alleging that Spink had negligently failed to cause the inclusion of a hold-harmless clause in the prime construction contract and to have the project owner listed as an additional insured on the prime contractor’s liability and workers’ compensation policies.
 

 When the Davis complaint was filed, Spink notified its two insurers. American had a claim manager in Sacramento. It employed a Sacramento law firm (henceforth the “defense attorneys”) to handle the Spink defense. Transit’s interests were in the care of a claim representative in Los Angeles. Because of the $15,000 deductible feature of its primary policy, Spink employed a Sacramento law firm as its personal counsel.
 

 At first the defense attorneys believed they could successfully defend Spink. Transit’s representative was so informed. As new facts came to
 
 *130
 
 light, however, the initial optimism was replaced by a recognition of potential liability, both for failure to properly supervise the job and for failure to protect the project owner with an indemnity clause. Spink’s personal attorney shared these premonitions of liability and so informed Spink officials. Although Transit’s representative had requested that he be kept informed, he was not told of this change of outlook.
 

 In June 1969, a month before trial, the Davis heirs offered to settle the case for a total of $300,000. The defense attorneys recommended a $50,000 contribution to settlement. Attorneys in Spink’s personal law firm had conflicting opinions regarding potential liability. Officials of the Spink firm consulted their insurance broker, who had a specialty of selling professional liability coverage to engineering firms. He thought a settlement by Spink would impair its future insurability and be disadvantageous to the engineering industry in general. Therefore he recommended that Spink refuse to settle and Spink officials accepted and were guided by this recommendation.
 

 When the trial opened in July 1969, the trial judge recommended acceptance of the still viable $300,000 settlement offer. Spink’s entire share of the recommended settlement was approximately $76,000, which of course was within the primary policy limits. The defense attorneys recommended settlement to Spink. Although the representatives of American believed that the settlement would be advantageous, they did not “pressure” Spink to settle. Officials of Spink stated that they would not settle under any circumstances, because a settlement would impair their insurability and that of the engineering industry.
 

 The American representatives did not inform Transit’s representative of these developments. The trial went badly for Spink. Testimony and court rulings resulted in gloomy forecasts of liability. Transit’s representative was finally told of the pessimistic outlook and sent a lawyer to observe the trial. Settlement negotiations were never resumed. The jury returned a verdict of $632,000 against the defendants, including Carlson, Gray and Spink. The trial court then held that Spink was liable to Carlson on the latter’s cross-complaint. (This bifurcated issue had been submitted to the trial judge by stipulation at the outset of the trial.)
 

 To satisfy Spink’s liability on the judgments held by Davis’ heirs and Carlson, the Spink firm paid $15,000, American $100,000, and Transit $175,000. And in September 1970, Transit contributed $285,000 to settle other death and injury claims resulting from the trench collapse. Transit
 
 *131
 
 then filed this suit. It charged that the unwarranted rejection of settlement by Spink and American had forced the Davis case to trial, to Transit’s ultimate direct damage, and had also increased the settlement outlay on the other death and injury claims.
 

 I
 

 Transit’s suit rests upon a variation of the duty-of-reasonable-settlement concept. Every insurance policy includes an implied covenant of good faith and fair dealing and that neither party will injure the interests of the other; the duty requires an insurer to settle when settlement is appropriate; in deciding whether to settle, the insurer must give the interests of its insured at least as much consideration as its own; when a settlement within the policy limits is available and will avoid the danger of a claim exceeding the policy limits, and is otherwise reasonable under all the circumstances, a good faith regard for the insured requires the carrier to settle.
 
 (Crisci
 
 v.
 
 Security Ins. Co.
 
 (1967) 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173];
 
 Comunale
 
 v.
 
 Traders & General Ins. Co.
 
 (1958) 50 Cal.2d 654, 659 [328 P.2d 198, 68 A.L.R.2d 883].) Wrongful refusal to settle constitutes both a breach of contract and a tort.
 
 (Gruenbergv. Aetna Ins. Co.
 
 (1973) 9 Cal.3d 566, 574 [108 Cal.Rptr. 480, 510 P.2d 1032];
 
 Crisci
 
 v.
 
 Security Ins. Co., supra, 66
 
 Cal.2d at p. 434.)
 

 The implied covenant of good faith and fair dealing does not burden the carrier alone; it is reciprocal, binding the policyholder as well as the carrier.
 
 (Comunale
 
 v.
 
 Traders & General Ins. Co., supra,
 
 50 Cal.2d at p. 658;
 
 Liberty Mut. Ins. Co.
 
 v.
 
 Altfillisch Constr. Co.
 
 (1977) 70 Cal.App.3d 789, 797 [139 Cal.Rptr. 91].)
 

 In the variant of the refusal-to-settle syndrome involved here, the excess insurer has sued both the policyholder and the primary carrier. A recent California decision,
 
 Northwestern Mut. Ins. Co.
 
 v.
 
 Farmers’ Ins. Group
 
 (1978) 76 Cal.App.3d 1031 [143 Cal.Rptr. 415], and decisions of other jurisdictions, have sustained this kind of claim on the theory that the excess carrier is equitably subrogated to the position of the policyholder, whose exposure to payment is brought about by the primary carrier’s refusal to settle.
 
 (Valentine
 
 v.
 
 Aetna Ins. Co.
 
 (9th Cir. 1977) 564 F.2d 292;
 
 American Fidelity & Cas. Co.
 
 v.
 
 All American Bus Lines
 
 (10th Cir. 1951) 190 F.2d 234;
 
 Peter
 
 v.
 
 Travelers Insurance Company
 
 (C.D.Cal. 1974) 375 F.Supp. 1347;
 
 Continental Casualty Co.
 
 v.
 
 Reserve Ins. Co.
 
 (1976) 307 Minn.5 [238 N.W.2d 862];
 
 Estate of Penn.
 
 v.
 
 Amalgamated General Agencies
 
 (1977) 148 N.J.Super. 419 [372 A.2d 1124]; cf.
 
 Universal
 
 
 *132
 

 Under. Ins. Co.
 
 v.
 
 Dairyland Mut. Ins. Co.
 
 (1967) 102 Ariz. 518 [433 P.2d 966]; Bloom,
 
 Recovery Against Primary Insurer By Excess Carrier For Bad Faith Or Negligent Failure To Settle
 
 (Apr. 1969) Ins. Counsel J., p. 235; Knepper,
 
 Relationships Between Primary and Excess Carriers in Cases Where Judgment or Settlement Value Will Exhaust the Primary Coverage
 
 (July 1953) Ins. Counsel J., p. 207.)
 

 Equitable subrogation is a legal device which permits a party who has been required to satisfy a loss created by a third party’s wrong to step into the shoes of the loser and recover from the wrongdoer.
 
 (Offer
 
 v.
 
 Superior Court
 
 (1924) 194 Cal. 114, 118-119 [228 P. 11].) (5) An insurance carrier thus may recoup a loss inflicted on its policyholder by equitable subrogation to the policyholder’s claim. (See, e.g.,
 
 Continental Cas. Co.
 
 v.
 
 Zurich Ins. Co.
 
 (1961) 57 Cal.2d 27, 37 [17 Cal.Rptr. 12, 366 P.2d 455];
 
 Continental Cas. Co.
 
 v.
 
 Phoenix Constr. Co.
 
 (1956) 46 Cal.2d 423, 429 [296 P.2d 801, 57 A.L.R.2d 914].)
 

 The subrogee’s rights, of course, can rise no higher than those of the subrogor. On this theory, American contends that the excess insurer, as subrogee, is defeated by the bad faith of the policyholder who refused to settle within the limits of the primary policy.
 
 [2]
 

 American’s contention rests on the assumption that equitable subrogation is a
 
 sine qua non
 
 of the excess insurer’s suit. The assumption will not survive analysis. Equitable subrogation is a descendant of historic equity practice; it is utilized as a device to achieve a just result by clothing a party with a right of recovery when he would otherwise be defeated by lack of privity.
 
 (Meyer Koulish Co.
 
 v.
 
 Cannon
 
 (1963) 213 Cal.App.2d 419, 423 [28 Cal.Rptr. 757]; see also
 
 Offer
 
 v.
 
 Superior Court, supra,
 
 194 Cal. 114.) Tested as an indispensable element of the excess carrier’s claim, equitable subrogation fails to achieve evenhanded justice. Excess insurance is a wise precaution and good business practice. The buyer of separate primary and excess coverage generally occupies relationships with two (or more) carriers. Usually, these have no contractual privity
 
 inter se.
 
 They are however fully aware of their respective roles and of the significant diflerences in their obligations to the insured for which greater
 
 *133
 
 or lesser premiums are charged. When an accident occurs, they become totally aware of each other. When the settlement value of the injury hovers over the upper limit of primary coverage, the two carriers face interacting problems of claim adjustment, settlement and defense. Each has a choice of mutual support or naked self-interest. The law, then, would be unrealistic in demanding that either carrier use the policyholder as its stepping stone to the assertion of a mutual obligation to each other. Triangular reciprocity is far more rational.
 

 Although it originated in the implied covenant of good faith and fair dealing, damage recovery for refusal to settle is more delictual than contractual. “Liability is imposed not for a bad faith breach of the contract but for failure to meet the duty to accept reasonable settlements. . . .”
 
 (Crisci
 
 v.
 
 Security Ins. Co., supra,
 
 66 Cal.2d at p. 430.) “The test [of liability] is whether a prudent insurer without policy limits would have accepted the settlement offer.”
 
 (Id.,
 
 at p. 429.) Imprudent failure of duty is the terminology of negligence law.
 

 A number of duty-to-settle decisions have commingled the issues of good faith and negligence; many more have moved beyond the good faith criterion, viewing negligence alone as a sufficient standard. (See cases collected in Annot., 40 A.L.R.2d 168, §§ 6, 7; cf.
 
 Palmer
 
 v.
 
 Financial Indem. Co.
 
 (1963) 215 Cal.App.2d 419, 428 [30 Cal.Rptr. 204];
 
 Davy
 
 v.
 
 Public National Ins. Co.
 
 (1960) 181 Cal.App.2d 387, 395 [5 Cal.Rptr. 488].) Enforceable norms of conduct need not depend upon the ancient artificiality of equitable subrogation. Good conscience was its progenitor. Good conscience is satisfied when reciprocal care forms the law’s prime demand.
 

 Four principles of care converge here:
 

 First:
 
 Rowland
 
 v.
 
 Christian
 
 (1968) 69 Cal.2d 108, 111-112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], reminds us that the foundation principle of California negligence liability is section 1714 of the Civil Code: “Eveiy one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself. . . ,”
 
 [3]
 

 
 *134
 
 Second: Adjutant to this concept is the duty of care principle, that is, that reasonable foreseeability of harm creates a duty of care, subject to negation only by judicially discerned policy factors.
 
 (Weirum
 
 v.
 
 RKO General, Inc.
 
 (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36];
 
 Rodriguez
 
 v.
 
 Bethlehem Steel Corp.
 
 (1974) 12 Cal.3d 382, 399 [115 Cal.Rptr. 765, 525 P.2d 669];
 
 Dillon
 
 v.
 
 Legg
 
 (1968) 68 Cal.2d 728, 739-741 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)
 

 Third: California observes the doctrine of comparative negligence, which diminishes a negligent plaintiff’s recovery in proportion to the contributory force of his negligence.
 
 (Li
 
 v.
 
 Yellow Cab Co.
 
 (1975) 13 Cal.3d 804, 828-829 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].)
 

 Fourth: When the negligence of multiple defendants causes a plaintiff’s loss, each is individually liable for all the loss (except that attributable to the plaintiff himself); among themselves, however, the defendants may apportion their liability by the rule of comparative negligence, using cross-complaints as their procedural media.
 
 (American Motorcycle Assn.
 
 v.
 
 Superior Court
 
 (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899].)
 

 Applied to the interacting settlement obligations of a policyholder, his primary insurer, and his excess insurer, these principles produce the following formulation: The parties occupy a three-way relationship, which regardless of privity gap may engender reciprocal duties of care in the conduct of settlement negotiations; when a damage claim threatens to exceed the primary coverage, the reasonable foreseeability of impingement on the excess policy creates a three-way duty-of-care; if the plaintiff in an ensuing failure-to-settle suit has been contributorily negligent, that plaintiff’s damage recovery from the other parties will be proportionately reduced; if all three parties have been negligent, their individual shares of the total loss may be fixed in a single lawsuit.
 

 Resort to equitable subrogation as the foundation of the excess insurer’s claim tends toward undesirable, all-or-nothing results. (See
 
 American Motorcycle Assn.
 
 v.
 
 Superior Court, supra,
 
 20 Cal.3d at pp. 599-604.) It produces litigation success or defeat according to the measure of conduct over which the party lacked control. A theory of liability resting upon a direct duty-of-care promotes sharing of the loss according to the measure of each party’s comparative fault.
 
 (Id.,
 
 at p. 598.)
 

 
 *135
 
 The three-way duty concept harmonizes with settlement realities. The policyholder pays for two kinds of liability coverage, each at a different rate. The premium charged by the primary insurer supports more localized claims adjustment facilities than those of the excess carrier. It takes into account costs of defense, including legal fees, which the primary insurer normally provides. The excess carrier is less frequently confronted with loss possibilities and, when it is, may employ local adjusters. The primary insurer is assisted, not impeded, by the active participation of another carrier with a stake in the negotiations. Self-interest will impel the primary carrier to take the lead when settlement value is well within its policy limits, the excess carrier when the claim invades its own policy exposure. When settlement value hovers over the fringes of both policies, both carriers may collaborate. Each may disagree with the settlement sentiments of the other; agreement is more likely when each knows that a jury may ultimately pass upon the reasonableness of its conduct. The primary carrier’s conflict of interest with the excess carrier is no more acute than its conflict with a policyholder without excess coverage. Either may sue it for a bad faith refusal to settle. Neither carrier is likely to be intransigent if both know that intransigence will be a factor for consideration in a later refusal-to-settle lawsuit. Triangular reciprocity advances the public interest in extrajudicial settlement.
 

 II
 

 Spink charges error in the jury instructions. The instructions informed the jury that the implied covenant of good faith and fair dealing bound all three parties, including the policyholder. The instructions thus adhered to our decisional doctrine. Spink contends that the settlement clause (fn. 1,
 
 ante),
 
 which empowered the policyholder to refuse settlement, eliminated the policyholder’s duty to settle.
 

 As we understand the matter, this sort of clause is characteristic of professional liability policies but not of general liability policies. (1 Long, The Law of Liability Insurance, § 5.26, p. 5-142, fn. 1.) The parties have apparently found no decisional interpretations of the clause. The policyholder argues that reservation of consent to settlement is vital in a professional liability policy; it permits the insurance buyer to reject a settlement which will blemish his professional reputation; the policyholder buys the privilege of absolute rejection, guided only by concern for his professional standing and bereft of concern for the insurance carrier, who, after all, sold the policy burdened by the clause in question.
 

 
 *136
 
 There is however a public interest in extrajudicial settlement of lawsuits.
 
 (Valentine
 
 v.
 
 Aetna Ins. Co., supra,
 
 564 F.2d at p. 297;
 
 Continental Casualty Co.
 
 v.
 
 Reserve Ins. Co., supra,
 
 238 N.W.2d at p. 864.) The settlement clause tends to defeat that interest and therefore will be narrowly construed so as not to defeat the covenant of good faith and fair dealing which is an implied reciprocal term of the policy. That covenant contemplates that neither party will injure unreasonably, and certainly not arbitrarily, the right of the other to receive the benefit of the agreement or to minimize a loss thereunder.
 
 (Gruenberg
 
 v.
 
 Aetna Ins. Co., supra, 9
 
 Cal.3d at p. 573.)
 

 Thus the settlement clause does not permit unreasonable rejection of settlement by the insured. This circumscription does not divest the clause of meaning. In a suit charging the policyholder with unreasonable refusal to settle, the clause provides him with an opportunity to convince a jury or judge that his refusal to agree to a settlement was reasonable under all the circumstances, including his concern for professional reputation. The settlement clause exhibits no inconsistency with the policyholder’s obligation of good faith. Inclusion of that obligation in the jury instructions was not error.
 

 Alternatively, Spink charges lack of substantial evidence to support the finding that it had violated its duty of reasonable settlement, claiming that the two insurance companies “clearly retained ultimate control over all settlement matters.” Nonconflicting evidence belies the claim. Either company could have invoked the second sentence of the settlement clause (fn. 1, ante) to protect it from liability exceeding the offered settlement. Neither did. By its rejection of settlement Spink alone invoked the clause. It had available to it the independent advice of its own attorneys. At the trial it produced no genuine evidence that the settlement would have actually damaged its insurability or blemished its professional standing. The only testimony on the score of impaired insurability was entirely speculative. In the wrongful death action a plaintiffs’ verdict far exceeding the primary coverage was reasonably foreseeable. The finding of Spink’s imprudent refusal to settle was supported by substantial evidence.
 

 Arguing in the same vein, Spink contends that its breach was not the proximate cause of Transit’s loss. This contention is almost sophomoric. Proximate cause is a question of fact for the juiy. (4 Witkin, Summary of Cal. Law (1974) Torts, § 621, p. 2903.) Suffice it to say that substantial evidence supports the jury’s implied finding that Spink’s
 
 *137
 
 breach contributed to the Davis verdict and to the ensuing settlements which impinged on the excess coverage.
 

 Spink argues that the settlement offer was illusory in the absence of evidence that the offer included settlement or waiver of the lien of the workers’ compensation carrier which had paid death benefits to Davis’ survivors. Raised for the first time on appeal, the argument comes too late. In order to determine whether the workers’ compensation carrier had an effective lien (per
 
 Witt
 
 v.
 
 Jackson
 
 (1961) 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641]) and whether waiver of the lien was a part of the settlement offer, factual inquiry was necessary. A party will not be permitted to urge a theory for the first time on appeal when the theory involves unsettled issues of fact.
 
 (Bogacki
 
 v.
 
 Board of Supervisors
 
 (1971) 5 Cal.3d 771, 780 [97 Cal.Rptr. 657, 489 P.2d 537].)
 

 Ill
 

 American, too, charges lack of substantial evidence for the finding that it breached an obligation to the excess insurer. American’s thesis is that its hands were tied by the settlement clause; that it had no control over Spink, which had the independent advice of its own attorneys; that Spink’s refusal to settle was the sole cause of the excess carrier’s loss.
 

 That either carrier’s hands were tied by the settlement clause is simply untrue. If invoked, the second sentence of the clause would have confronted the policyholder with a large uninsured (by American or Transit) liability. By invoking that provision, either carrier could have parried the intransigence of the policyholder and very possibly avoided the later disaster to all three.
 

 American’s causation argument ignores the elementaiy proposition that a tortious injury may result from two independently concurring causes. As we have pointed out, all three parties shared reciprocal duties of care. American’s representatives were tardy in informing Transit’s claim representative in Los Angeles that a loss threatening the excess coverage might be in the offing. Although their attorney recommended the settlement to Spink, American’s representatives did not warn Spink that they might invoke the provision limiting their own exposure; neither did they give Transit information which might have permitted that company to invoke the provision. There was substantial evidence from
 
 *138
 
 which reasoning jurors could infer that the conduct of American’s agents was a substantial cause of the breakdown in settlement negotiations.
 
 [4]
 

 IV
 

 The jury was fully and accurately instructed on the reciprocal duties of care owed each party by the others. No specific contributory negligence instructions were given, and ndne were requested despite the pleadings. Nor did defendants pursue against Transit the more appropriate theory of comparative fault.
 
 (Li
 
 v.
 
 Yellow Cab Co.,
 
 supra; see
 
 Safeway Stores, Inc.
 
 v.
 
 Nest-Kart
 
 (1978) 21 Cal.3d 322 [146 Cal.Rptr. 550, 579 P.2d 441].)
 
 [5]
 
 Any omission resulting from that choice was invited by defendants. When a case is tried on the parties’ theory, and is otherwise unaffected by error, the judgment must be affirmed. (See, e.g.,
 
 Ernst
 
 v.
 
 Searle
 
 (1933) 218 Cal. 233 [22 P.2d 715]; see also
 
 Daly
 
 v.
 
 General Motors Corp.
 
 (1978) 20 Cal.3d 725, 743-744 [144 Cal.Rptr. 380, 575 P.2d 1162]; cf.
 
 Safeway Stores, Inc.
 
 v.
 
 Nest-Kart, supra,
 
 21 Cal.3d at pp. 333-334.)
 

 The judgment is affirmed.
 

 Janes, Acting P. J., and Evans, J., concurred.
 

 Petitions for a rehearing were denied July 10, 1979, and the petitions of appellants Spink Corporation and American Motorists Insurance Company for a hearing by the Supreme Court were denied August 15, 1979. Bird, C. J., and Mosk, J., were of the opinion that the petitions should be granted.
 

 [1]
 

 The Transit excess policy incorporated the terms of the American primary policy. The latter provided: “. . . The company shall not settle any claim without the written consent of the insured. If, however, the insured shall refuse to consent to any settlement recommended by the company and shall elect to contest the claim or continue any legal proceedings in connection with such claim, then the company’s liability for the claim shall not exceed the amount for which the claim would have been settled, plus the cost and expenses incurred, with its consent, up to the date of such refusal.”
 

 [2]
 

 In approving subrogation as the basis of the excess carrier’s claim, the
 
 Northwestern Mutual
 
 opinion (76 Cal.App.3d 1031) did not confront a policyholder who had contributed to the demise of settlement. Here in contrast, the jury has found the policyholder (along with primary carrier) guilty of wrongful refusal to settle. This circumstance subjects the equitable subrogation theory to hard scrutiny. Unlike the
 
 Northwestern Mutual
 
 court, we must decide whether equitable subrogation is indispensable to the vitality of the excess carrier’s claim.
 

 [3]
 

 As we now all know, our Supreme Court undid the exception expressed in section 1714 in
 
 Li
 
 v.
 
 Yellow Cab. Co.
 
 (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393],
 

 [4]
 

 We here acknowledge (with respect and gratitude) the substantial contribution of our former colleague Leonard M. Friedman in that portion of this opinion which precedes this footnote. Except for a few changes, largely editorial, it has been repeated here as he authored it prior to his recent retirement and to our later grant of rehearing.
 

 [5]
 

 The case was tried over one year after the Supreme Court’s decision in
 
 Li
 
 v.
 
 Yellow Cab Co., supra,
 
 13 Cal.3d 804.