547 So.2d 1339 (1989)
GREAT SOUTHWEST FIRE INSURANCE COMPANY, Plaintiff-Respondent,
v.
CNA INSURANCE COMPANIES and Transportation Insurance Company, Defendants-Relators.
No. W88-715.
Court of Appeal of Louisiana, Third Circuit.
July 12, 1989.
*1340 Landry, Watkin & Bonin, Alfred S. Landry, New Iberia, for defendants-relators.
Hurlburt, Privat & Monrose, David A. Hurlburt, Lafayette, for plaintiff-respondent.
Before GUIDRY, LABORDE and KING, Judges.
KING, Judge.
The issue presented by this appeal is whether or not an excess insurer has a right or cause of action for damages against a primary insurer for the latter's bad faith failure to properly defend and/or settle a liability claim on behalf of their mutual insured.
Great Southwest Fire Insurance Company (hereinafter plaintiff) filed suit for damages, attorney's fees, and costs, as the excess insurer of its insured, Contract Cleaners, Inc., against CNA Insurance Companies and Transportation Insurance Company (hereinafter defendants), as the primary insurers of Contract Cleaners, Inc. Plaintiff's suit was based on defendants' bad faith failure to properly defend and settle a claim against Contract Cleaners, Inc. which resulted in a judgment, exceeding the primary insurance coverage limit, that plaintiff had to pay as the excess insurer. Defendants filed peremptory exceptions of no right of action and no cause of action which were denied by the trial court. A formal written judgment was signed denying the exceptions and denying defendants' motion for a new trial. Defendants sought supervisory relief from this court from the denial of their exceptions and this relief was denied. Great Southwest Fire Ins. Co. v. CNA Ins. Companies, etc., an unreported decision bearing Number 88-715 on the Docket of this court dated July 19, 1989. Defendants then sought supervisory relief from the Louisiana Supreme Court. The Louisiana Supreme Court granted defendants' writ and remanded the case to this court for briefing, argument, and rendition of a written opinion. Great Southwest Fire Ins. Co. v. CNA Ins. Companies, 533 So.2d 3 (La. 1988). In compliance with the order of the Louisiana Supreme Court, the matter was docketed in this court for briefing and oral argument. We now issue a written opinion affirming the decision of the trial court and remanding the matter to the trial court for further proceedings.

FACTS
An accident occurred on or about January 25, 1983 which resulted in a lawsuit entitled, "John C. Youngblood v. Contract Cleaners, Inc., et al.", bearing Number 83-7266-J on the Docket of the Fifteenth Judicial District Court for Lafayette Parish, Louisiana (hereinafter the Youngblood suit). At the time of the accident, Contract Cleaners, Inc. (hereinafter the insured) had a policy of primary liability insurance in full force and effect which was issued by the defendants, CNA Insurance Companies and Transportation Insurance Company. The insured also had in full force and effect at the time of the accident a policy of excess liability insurance issued by the plaintiff, Great Southwest Fire Insurance Company. Plaintiff and defendant, Transportation Insurance Company, were not made defendants in the Youngblood suit and were not ever sued as parties in the *1341 suit. However, Transportation Insurance Company undertook the defense of the Youngblood suit. Plaintiff alleges that upon receiving notice of the Youngblood suit, it contacted defendants and asked to be kept informed about the progress of that litigation. Plaintiff further claims that no reports were received from defendants and that the only information given them by defendants concerned a pre-trial offer of settlement from Youngblood for an amount which was less than the defendants' primary policy limit. At that time, plaintiff alleges that it made demand, for both the insured and itself, upon defendants to settle the Youngblood suit within their policy limit. The offer of settlement in the Youngblood suit was never accepted by defendants and the suit then proceeded to trial. After trial on the merits, judgment was rendered in favor of Youngblood and against the insured and defendants for $396,137.43, together with legal interest from date of judicial demand, until paid, and all costs of the proceeding. The policy limit on the primary policy of defendants was only $300,000.00. Defendants suspensively appealed $300,000.00 of the judgment in the Youngblood suit, representing the amount of the judgment covered by defendants' policy limit. Defendants devolutively appealed the balance of the judgment in the Youngblood suit, representing the amount of the judgment against the insured which would be payable by it, and which would also be payable by plaintiff as the excess insurer of the insured, if the judgment in the Youngblood suit was affirmed on appeal. The appealed judgment in the Youngblood suit was settled. Defendants paid their policy limits and accrued legal interest on behalf of the insured. Plaintiff paid on behalf of the insured an amount for settlement of the balance of the judgment, in excess of defendant's primary policy limit, and then filed this suit to recover that sum. Plaintiff actually paid $110,043.81 and defendants actually paid $323,560.00 toward settlement of the appealed judgment in the Youngblood suit.
Plaintiff alleged in its petition that defendants were arbitrary and capricious in their intentional bad faith refusal to properly defend and to settle the Youngblood suit within the primary policy limit.
Defendants filed peremptory exceptions of no right of action and no cause of action to plaintiff's suit. Defendants contend that a primary insurer owes no legal duty to the excess insurer in either the defense or settlement of a suit against their mutual insured for which the breach would permit an excess insurer to directly seek damages for a bad faith failure to defend or settle the suit within the primary policy limits. Defendants further contend that plaintiff cannot be subrogated to the insured's bad faith claim against them. The defendants' exceptions of no right of action and no cause of action were denied by the trial court. A judgment denying the exceptions was signed and defendants' motion for a new trial was denied. Defendants sought supervisory relief from this court, from the denial of their exceptions, which was denied on July 19, 1988. Defendants then applied to the Louisiana Supreme Court for supervisory relief and a writ was granted on November 18, 1988, remanding the case to this court for briefing, argument, and rendition of a written opinion.

LAW
A combined peremptory exception of no right and/or no cause of action is to be treated as an exception of no right of action and as an exception of no cause of action. Robinson v. North American Royalties, Inc., 463 So.2d 1384 (La.App. 3 Cir.1985), amended on other grounds, 470 So.2d 112 (La.1985), appeal after remand 509 So.2d 679 (La.App. 3 Cir.1987).
The essential function of the peremptory exception of no right of action is to raise the question whether a remedy afforded by law can be invoked by a particular plaintiff; it relates specifically to the person of the plaintiff. Henry v. State through Dept. of Health, 435 So.2d 565 (La.App. 3 Cir.1983), writ denied, 441 So.2d 750 (La.1983). On the trial of the peremptory exception of no right of action, pleaded at or prior to the trial of the case, evidence may be introduced to support or *1342 controvert the exception when the grounds thereof do not appear from the petition. La.C.C.P. Art. 931.
The exception of no cause of action is a procedural device used to test whether, under the allegations of the petition, the law affords any remedy for the grievance asserted. LSA-C.C.P. Art. 931; Bellah v. State Farm Fire and Cas. Ins. Co., et al, 546 So.2d 601 (La.App. 3 Cir. 1989), an unreported decision bearing Docket Number 88-448 rendered on June 27, 1989; Ward v. Pennington, 434 So.2d 1131 (La.App. 1 Cir.1983), writ den., 438 So.2d 572, 576 (La.1983); McIntyre v. McIntyre, 519 So.2d 317 (La.App. 2 Cir.1988). For purposes of ruling on an exception of no cause of action, the court must accept all allegations of the petition as true and sustain the exception only if the law affords no remedy under any evidence admissible under the pleadings. Darville v. Texaco, Inc., 447 So.2d 473 (La.1984); Stock v. East Baton Rouge City-Parish, 525 So.2d 675 (La.App. 1 Cir.1988). If the petition states a cause of action as to any ground or portion of the demand, the exception of no cause of action must be overruled. Pitre v. Opelousas General Hosp., 530 So.2d 1151 (La.1988); Stock, supra; C.O.S.T. v. St. Landry Parish School Bd., 528 So.2d 1048 (La.App. 3 Cir.1988). As we stated in Ford Motor Credit Company v. Soileau, 357 So.2d 563 (La.App. 3 Cir.1978).
"`The purpose of the exception of no cause of action is to test the legal sufficiency of the pleadings. Well pleaded facts alleged in the petition are taken as true. If any reasonable construction of the alleged facts could lead to possible legal recovery, the exception must be overruled. Normally, evidence may not be considered for the purposes of sustaining an exception of no cause of action. The exception can be sustained only when the allegations, as stated in the petition, affirmatively establish that no relief can be granted under the law.' (Citations and Footnotes omitted.)" Ford Motor Credit Company v. Soileau, 357 So.2d 563, at page 565 (La.App. 3rd Cir.1978).
See also Peloquin v. Calcasieu Parish Police Jury, 367 So.2d 1246 (La.App. 3 Cir. 1979), after remand, 378 So.2d 560 (La.App. 3 Cir.1979).
No evidence may be introduced at any time to support or controvert the objection that the petition fails to state a cause of action. La.C.C.P. Art. 931. The court will try the exception of no cause of action on the face of the petition. Darville v. Texaco, Inc., supra.
The pleadings in this case specifically allege that plaintiff has an independent direct cause of action against the defendants for their negligent, intentional, and bad faith failure to defend and settle the Youngblood suit within their policy limits prior to trial, for their failure to protect the interests of the insured subsequent to trial, and for their failure to timely tender their policy limits after rendition of judgment. The pleadings also allege plaintiff has a derivative cause of action as it is subrogated, both legally and conventionally, to the right of the insured to assert a claim against defendants' for their bad faith failure to defend and settle the Youngblood suit within their primary policy limits prior to trial. Following the dictates of the Peloquin and Ford Motor cases, these allegations must be taken and accepted as true for purpose of trial of the defendants' exception of no cause of action.
There has been a substantial amount of litigation involving the various legal theories under which an excess carrier can impose responsibility upon the primary carrier for judgments in excess of the primary carrier's policy limits. The courts have struggled with legal concepts of liability in such cases and, as a result, there are inconsistent and conflicting decisions. As a result of such litigation, several theories of liability have emerged.
It is only a primary insurer's bad faith that can create liability. The imposition of liability upon the primary insurer for damages in excess of its primary policy limits is based upon the primary carrier's insurance policy provisions which reserve to the primary insurer full control of the litigation, including the defense and settlement negotiations. *1343 The rationale has been that by reserving these rights to its exclusive control, the primary insurer must conduct itself reasonably and take only those actions which a reasonable person would take. Courts have extended this reasoning by finding an implied covenant of good faith within every insurance policy and allowing recovery of compensatory damages where the insurer fails to observe the covenant of good faith. The additional liability to which the primary insurer is exposed as a result of its "bad faith" in failing to provide an adequate defense or in failing to settle within policy limits, is the imposition of liability for the amount by which any judgment exceeds the primary policy limit.
The initial suits brought by excess carriers against primary carriers ran into difficulty due to the fact that there was no contractual relationship between the primary and excess carriers. Typically, the insured contracts independently with both the primary and excess carriers and often it is only through disclosure by the insured after a loss that the primary carrier knows of the excess carrier.
The initial problems with the lack of privity between the primary and excess carriers were overcome by simply recognizing that the excess carrier was subrogated to the rights of the insured and could, therefore, pursue any claims against the primary carrier that the insured might have. Some cases then turned on the distinction between equitable subrogation and contractual subrogation. Contractual subrogation arises by way of provisions within the policy itself, or, as is frequently the case, by way of the proof of loss form. These contractual provisions simply recognize that where payment is made by an insurer to the insured or to someone on the insured's behalf, the insurer becomes subrogated to all rights of the insured. On the other hand, many policies do not contain subrogation provisions and in those situations the right to subrogation has been held to rest upon common law principles of equity. The elements of equity upon which equitable subrogation is based are: (1) the insured has suffered a loss; (2) the insurer has compensated the insured in whole or part; (3) the insured has an existing assignable cause of action but for the insurer's compensation; (4) the insurer has suffered damages; (5) justice requires that the loss be entirely shifted from the insurer; and, (6) the insurer's damages are a specified sum and were not voluntarily or unreasonably paid.
Equitable subrogation is a descendant of historic equity practice; it is utilized as a device to achieve a just result by clothing a party with a right of recovery when he would otherwise be defeated by a lack of privity. Transit Cas. Co. v. Spink Corp., 94 Cal.App.3d 124, 156 Cal.Rptr. 360 (1979) and cases cited therein; Commercial Union Ins. Co. v. Medical Protective Co., 426 Mich. 109, 393 N.W.2d 479 (1986).
The common law theory of equitable subrogation does not exist in Louisiana. American Bank and Trust Co. v. Trinity Universal Ins. Co., 194 So.2d 164 (La.App. 1 Cir.1966). The only two types of subrogation recognized in Louisiana, i.e., legal and conventional, are provided for in our Civil Code. La.C.C. Art. 1825.
In addition to equitable or contractual subrogation, many policies contain an assignment clause providing the insurer with an assignment of or the right to demand an assignment of all compensated claims. The excess carriers have also utilized such an assignment in pursuing a bad faith cause of action against the primary carrier for that portion of the judgment in excess of policy limits.
Excess carriers were concerned with proceeding against the primary carrier on the basis of subrogation or assignment of claim because by doing so, the primary carrier could then assert against the excess carrier all defenses which the primary carrier had against the insured. For instance, if the insured has failed to cooperate with the primary carrier and this lack of cooperation caused or contributed to a judgment in excess of policy limits, the primary carrier could assert the lack of cooperation as a defense against any action brought by the insured, its subrogee or assignee.
*1344 To avoid the application of such defenses, excess carriers then sought to establish a direct legal duty owed by the primary insurer directly to the excess carrier. The first case in which this argument was apparently successful was Hartford Accident & Indemnity Co. v. Michigan Mut. Ins. Co., 93 A.D.2d 337, 462 N.Y.S.2d 175 (1983), aff'd 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984). This case presented a situation where the excess carrier was not asserting that the primary insurer acted in bad faith towards its insured, but only towards the excess carrier. The primary carrier carried the Worker's Compensation insurance for an employer, whose employee sustained injury. The primary insurer was also the liability insurer for the employer's parent corporation. In his suit, the injured employee named only the parent corporation. The excess insurer demanded that the employer be impleaded as a third party defendant, but the primary carrier refused to do so, arguably because it was also the Worker's Compensation insurer for the employer and would be liable for any awarded judgment. The lawsuit resulted in a settlement beyond the primary carrier's limits, thereby involving payment by the excess insurer who insured the parent corporation.
The excess carrier claimed that had the employer been impleaded as a third party defendant, responsibility would have been attached to the employer and the excess coverage would not have been reached. To further complicate matters, the primary carrier was an additional insured under the excess carrier's policy, and, therefore, it was argued that the excess carrier could not subrogate against its own insured, the primary carrier.
The court resolved the matter in favor of the excess carrier by finding that the primary carrier owed a fiduciary duty to the excess carrier. This fiduciary duty was created by the primary carrier's control of the defense. "As primary insurer, it acts as a fiduciary and is held to an exacting standard of utmost good faith. Any such right of action arises as a result of the independent and direct duty to the excess insurer and is not dependent upon equitable principles of subrogation." Id. 462 N.Y.S.2d at page 178.
Subsequent to the Hartford case, however, many courts began to recognize the important distinction between a derivative right, because of a subrogation or assignment, and an independent direct legal right, because of a legal duty. These courts have declined to recognize a direct legal duty owed by the primary carrier to the excess carrier for either defense or settlement of claims.
Several Louisiana cases have addressed this precise issue and found that the primary carrier owed no independent direct legal duty to the excess carrier for either defense or settlement of a claim against a mutual insured. Laper v. Board of Com'rs, 523 So.2d 926 (La.App. 4 Cir.1988), writ den., 531 So.2d 275 (La.1988); Petrol Industries v. Gearhart-Owen Industries, Inc., 424 So.2d 1059 (La.App. 2 Cir. 1982). However, another Louisiana court, while not reaching the same issue, found persuasive the legal authority that recognized that the primary insurer owed such an independent direct legal duty to the excess insurer. Southern American Ins. v. Hartford Acc., 498 So.2d 280 (La.App. 1 Cir. 1986), writ den., 500 So.2d 425 (La.1987). In Laper, supra, the excess insurer filed a third party demand against the primary carrier alleging negligence and bad faith. More specifically, the excess carrier contended, inter alia, that the primary carrier: (1) failed to inform the insureds or the excess carrier of the pendency, developments or substance of settlement negotiations; (2) failed to cooperate with and inform the excess carrier of the status of the action; (3) failed to communicate to the excess carrier its knowledge as to the extent of the insureds' exposure, and (4) precipitously withdrew from active defense of the insureds with knowledge that this would prejudice the excess carrier. Id. at page 927. The court in the Laper case recognized that no cause of action existed, because there was no independent direct legal duty owed by the primary insurer to the excess insurer to either defend or settle a claim, by saying that:

*1345 "A duty to defend flows from the insurer to the insured and no such duty is owed to the excess insurer. See: Cousins v. State Farm Mutual Automobile Insurance Co., 294 So.2d 272 (La.App., 1st Cir., 1974); Petrol Industries Inc. v. Gearhart-Owen Industries, Inc., 424 So.2d 1059 (La.App., 2nd Cir., 1982). The Louisiana Civil Law Treatise: Insurance Law and Practice, McKenzie & Johnson, Section 214 pp. 382-383 states: `The Louisiana cases are unanimous in the conclusion that the primary insurer has no duty to defend the excess insurer.' Fusilier v. Dixie Automobile Insurance Co., 238 So.2d 223 (La.App., 3rd Cir., 1970) writ den., 256 La. 897, 240 So.2d 233 (1970); Cooper v. Christensen, 212 So.2d 154 (La.App., 4th Cir., 1968) writ ref. 252 La. 899, 214 So.2d 720 (1968); Lumbermens Mutual Casualty Co. v. Connecticut Fire Insurance Company, 239 So.2d 472 (La.App., 4th Cir., 1970), writ ref. 256 La. 1157, 241 So.2d 255; Petrol Industries v. Gearhart-Owen Industries, supra. As to the possibility of an obligation being owed by a primary insurer to an excess insurer in the settlement of its claim, the Louisiana Civil Law Treatise; Insurance Law and Practice, supra at Section 221, pp. 405-407, states the general rule that:
`In keeping with its conclusion that a primary insurer has no obligation to defend an excess insurer, Louisiana jurisprudence has not recognized any obligation owed by a primary insurer to an excess insurer in the settlement of claims. Futch v. Fidelity & Casualty Co., 246 La. 688, 166 So.2d 274 (1964). See also, American Home Assurance Company v. Commercial Union Assurance Co., 379 So.2d 757 (La.App., 4th Cir., 1979) writ den. 383 So.2d 23 (1980), cert. den. 449 U.S. 871, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980); Gasquet v. Commercial Union Ins. Co., 391 So.2d 466 (La.App., 4th Cir., 1980) writ den. 396 So.2d 921 (1981).'
Although appellant relies upon two federal district court decisions in support of its position that the primary insurer owes a duty to the excess insurer, we find these decisions to be contrary to the established jurisprudence of this state and for this reason, we refuse to follow them. Insurance Company of North America v. Home Insurance Co., 644 F.Supp. 359 (E.D.La.1986); Utica Mutual Insurance Co. v. Coastal Marine, Inc., 578 F.Supp. 1376 (E.D.La.1984)." Laper v. Board of Com'rs., 523 So.2d 926, at page 928 (La.App. 4 Cir.1988), writ den., 531 So.2d 275 (La.1988).
The dissent in Laper endeavored to distinguish the cases relied upon by the majority on the basis that those cases did not involve a primary carrier who had allegedly acted with intentional bad faith. Id. at page 929. The dissent, in rejecting the majority's holding, noted that the Louisiana Supreme Court had never addressed the issue. The dissent, however, relied on two Louisiana federal district court cases wherein the primary carrier was held to owe an independent direct legal duty of good faith to the excess carrier. See, Ins. Co. of North America v. Home Ins. Co., 644 F.Supp. 359 (E.D.La.1986) and Utica Mutual Insurance Company v. Coastal Marine, Inc., 578 F.Supp. 1376 (E.D.La. 1984). Interestingly, neither Utica nor Home Insurance relied on any Louisiana jurisprudence to support their holdings regarding the independent direct legal duty of a primary carrier to the excess carrier.
In a Louisiana federal district court case decided before Laper but after Utica and Home Insurance, the excess insurer alleged that the primary insurer had "arbitrarily, capriciously and in bad faith refused to settle the case within its primary policy limits exposing ... the excess insurer to liability." Pacific Employers Ins. Co. v. United General Ins., 664 F.Supp. 1022, at page 1022 (W.D.La.1987). The court in Pacific Employers considered and found that Louisiana jurisprudence did not support a direct cause of action by an excess carrier against the primary carrier for failing to settle in good faith and stated that:
"We reiterate that no Louisiana court has yet considered whether there is any basis under Louisiana law for recovery of damages by an excess insurer *1346 based upon the conduct of the primary insurer in not settling the case within the limits of the primary coverage. But, the jurisprudence is explicit that the excess insurer is only entitled to credit for the primary coverage and has no right to prevent the primary insurer from settling its liability for less than the primary limits nor to recoup any payments which the excess insurer is required to make. While these cases do not specifically discuss whether the primary insurer holds any settlement duty to the excess insurer similar to that which is owed to the insured, the holdings are clearly inconsistent with such a duty." (Emphasis supplied.) Pacific Employers Ins. Co. v. United General Ins., 664 F.Supp. 1022, at pages 1023-1024.
See also, Twin City Fire Ins. Co. v. CNA Ins. Co., 711 F.Supp. 310 (W.D.La.1988).
The author of the opinion in Utica, in a post-Laper decision, declined to follow the reasoning of the Pacific Employers and Laper cases. National Union Fire Ins. v. Liberty Mut. Ins. Co., 696 F.Supp. 1099 (E.D.La.1988). The federal district court in National Union cited no Louisiana jurisprudence to support its conclusion that the Louisiana Supreme Court would follow the rationale set forth in the dissenting opinion in Laper, and held that under Louisiana law a primary carrier owes a direct duty to the excess carrier to act reasonably and in good faith in handling the defense of their mutual insured. Id. at page 1101.
The Louisiana jurisprudence, as well as decisions of many of the federal district courts in Louisiana, reject the legal theory that a primary insurer owes any independent direct legal duty to an excess insurer regarding defense or settlement of claims on behalf of their mutual insured. We also choose to adopt this position.
Plaintiff next argues that the insured had a cause of action and could be awarded damages against defendants, as its primary insurer, because of defendants' bad faith and arbitrary and capricous refusal to defend and settle the claim against the insured within the primary policy limit prior to trial. Plaintiff claims to be legally and conventionally subrogated to this legal right owed by the defendants to the insured.
In Hodge v. American Fidelity Fire Ins. Co., 486 So.2d 233 (La.App. 3 Cir.1986), writ den., 489 So.2d 917 (La.1986), this court succinctly set forth the law relative to an insurer's duty to settle:
"The jurisprudence is clear that a liability insurer is not required to settle a claim against its insured even within the policy limits under the penalty of an absolute liability for any excess judgment which may be rendered against its insured. However, the insurer may be liable to its insured for the judgment in excess of policy limits for which the insured is cast where the insurer's failure to accept the settlement offer is not in good faith, or is arbitrary or capricious under the circumstances. See Champion v. Farm Bur. Ins. Co., 352 So.2d 737 (La.App. 3rd Cir.1977); Trahan v. Central Mutual Ins. Co., 219 So.2d 187 (La. App. 3rd Cir.1969); Younger v. Lumbermen's Mutual Casualty Co., 174 So.2d 672 (La.App. 3rd Cir.1965); Wooten v. Central Mutual Insurance Co., 166 So.2d 747 (La.App. 3rd Cir.1964).

The insurer has a duty to protect its insured. In the case of Domangue v. Henry, 394 So.2d 638 (La.App. 1st Cir. 1980), the court stated:
`Louisiana jurisprudence establishes that a duty is placed upon the insurer to consider the interest of the insured as paramount when an offer to settle is made. The insurer has a duty to act in good faith and to deal fairly when handling and settling claims in order to protect the insured from exposure to excess liability. See Holtzclaw v. Falco, [sic] 355 So.2d 1279 (La.1978); Moskau v. Insurance Company of North America, 366 So.2d 1004 (La.App. 1st Cir.1978); Comment, Duty of Insurer to Settle, 30 La.L.Rev. 622 (1970).'" (Footnotes omitted; Emphasis added.) Hodge v. American Fidelity Fire Ins. Co., 486 So.2d 233, at page 236 (La.

*1347 App. 3 Cir.1986), writ den., 489 So.2d 917 (La.1986).
La.C.C. Art. 1829(3), formerly La.C.C. Art. 2161(3), states that subrogation takes place by operation of law "In favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment;".
The Supreme Court interpreted this provision under the former article in Aetna Ins. Co. v. Naquin, 488 So.2d 950 (La. 1986). The court held that because Aetna had made payments to tenants under property damage provisions of a landlord's policy, Aetna could recover from the contractor responsible for the damages caused by its breach of its contract with the landlord. The court found that Aetna could recover even though the landlord did not join in Aetna's suit and Aetna was not conventionally subrogated under the contract. In holding that Aetna was legally subrogated, the court stated:
"The granting of subrogation is completely compatible with the whole of Louisiana law. The insurer is not a mere volunteer who has paid the debt. Therefore he should not fit under the general rule of LSA-C.C. art. 2134. The Code recognizes that a person with an interest who pays in his own name and is bound with the other debtor ought to be subrogated to the creditor's rights against the other debtor, unlike a mere volunteer. This recognition is embodied in LSA-C.C. art. 2161(3).
Subrogation is also consistent with Louisiana law concerning collateral sources. The `collateral sources' doctrine serves to prevent the defendant from receiving a windfall because the victim has chosen to provide, by contract, other sources of redress for injury. We do not permit this credit for the defendant because of the recognition that he is in fact liable for the harms so paid for by others. To the extent that others properly present their claims they should be reimbursed.
Support for the proposition that Aetna is bound with Naquin can also be found in the 1984 revision of the Civil Code (see fn. 2 supra). In the official comments to LSA-C.C. art. 1829(3), comment (d), states that, `An obligor is bound "with" another under this article regardless of whether his obligation arises from the same act as the obligation of the other or from a different act.' In this case Aetna was bound with Naquin for the damages to the tenants. Aetna was bound for a different reason than Naquin but they were bound for the same thing. It is unnecessary to examine the relationship of the parties for solidarity as we have concluded that LSA-C.C. art. 2161(3) does not require solidarity. Therefore we hold that Aetna, having paid a debt which they were bound with Naquin, is entitled to be legally subrogated to their insureds' breach of contract action against Naquin." (Footnote omitted.) Aetna Ins. Co. v. Naquin, 488 So.2d 950, at page 954 (La.1986).
In the present case, plaintiff was bound with the insured for the amount in excess of defendants' primary policy limits. Defendants' alleged obligation to the insured arises from their wrongdoing, i.e., a bad faith breach of their defense and settlement duty owed to the insured, while plaintiff's obligation arose from their contract with the insured. Under the rationale of Naquin, supra, plaintiff should be entitled to be legally subrogated to the claim of the insured, who is also plaintiff's insured, in the insured's bad faith breach of contract action against defendants. Plaintiff has also alleged that the insured has conventionally subrogated it to the cause of action the insured has against defendants for their failure to settle. We must also accept this allegation as true for the purpose of the exception of no cause of action.
Defendants' contention that the insured has not been damaged, because the plaintiff paid the amount of the Youngblood judgment in excess of defendants' primary policy limits and therefore has no cause of action to subrogate, is without merit because of the collateral source rule. Under the "collateral source" rule our courts permit recovery of damages incurred *1348 by a plaintiff which he will never have to pay since they have been paid from another source. See, e.g. Aetna Ins. Co. v. Naquin, supra; Hudson v. Thompson, 422 So.2d 640 (La.App. 3 Cir.1982). A plaintiff in a personal injury action has never been required to pay or show that he is able to pay expenses incurred in order to recover them. 22 Am.Jur.2d Damages, Sec. 170 (1965); 2 Harper and James, Torts, Sec. 25.9 (1956); Annot. 25 A.L.R. 579 (1923); Annot. 65 A.L.R.2nd 1426 (1959). See Dumas v. State Farm Mut. Auto Ins. Co., 111 N.H. 43, 274 A.2d 781 (1971), and cases cited therein. A cause of action for bad faith failure to settle is not dependent upon the insured's prior payment or the certainty of his future payment of the judgment against him. Allstate Ins. Co. v. Reserve Ins. Co., 116 N.H. 806, 373 A.2d 339 (1977); Dumas v. State Farm Mut. Auto Ins. Co., supra; Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136, at page 1175 (1954). There is simply no logical reason to allow legal or conventional subrogation of personal injury and property damage claims, collision claims, medical payment claims, and uninsured motorist claims, but to not allow legal or conventional subrogation to an excess insurer of a claim for a bad faith failure to defend or settle within the primary policy limit prior to trial. Defendants without excess coverage, who were cast for an excess judgment, have assigned their rights for a bad faith claim for damages against their primary insurer to their judgment creditors, in settlement of the excess judgment, and the judgment creditors, as the assignees, have been permitted to assert the claims. Judgment creditors of a debtor, who have seized such bad faith claims of their debtors, have been permitted to assert the claims.
While McKenzie and Johnson in 15 La.Civil.Law Treatise, Insurance Law and Practice, Section 221 at page 406 state that there is no independent direct legal duty owed by the primary insurer to the excess insurer in connection with settlement of a claim against their mutual insured, it does not discuss whether the excess insurer can be subrogated to the insured's claim. Section 222 then goes on to note that the duty to settle is owed only to the insured, "Therefore, claims for breach of these duties must be asserted by the insured or by someone who derives his right from the insured." "(Emphasis supplied.) Id. at page 407. It does not appear that these commentators suggest any reason why the excess insurer should not be subrogated to such rights of the insured. In fact these same commentators note, in their discussion of the legal subrogation concept of Naquin, that "The law should seek to assign the loss to the wrongdoer unless there is a good reason to reach a contrary result." Comment, McKenzie and Johnson, Insurance Law, 47 La.L.Rev. 518 (1987). McKenzie and Johnson also note many Louisiana cases where assignees and even judgment creditors who have been assigned or seized such claims, have been permitted to prosecute such bad faith claims of the insured against the primary insurer. Id. at page 407; see the numerous cases cited in footnotes 10 and 11.
Since the insured would have been able to recover from the primary insurer for a judgment in excess of policy limits caused by the primary insurer's wrongful refusal to settle, the excess insurer, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims against the primary insurer which the insured himself could have asserted. Comm. Union Ins. Co. v. Medical Protective Co., supra. Commercial Union Assurance Cos. v. Safeway Stores, 26 Cal.3d 912, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980). Accord Continental Casualty Co. v. Reserve Ins. Co. 307 Minn. 5, 238 N.W.2d 862 (1976); North River Ins. Co. v. St. Paul Fire & Marine Ins. Co., 600 F.2d 721 (CA 8, 1979); Ranger Ins. Co. v. Travelers Indemnity Co., 389 So.2d 272 (Fla.App.1980); Centennial Ins. Co. v. Liberty Mut. Ins. Co., 62 Ohio St.2d 221, 404 N.E.2d 759 (1980); Portland General Electric Co. v. Pacific Indem. Co., 579 F.2d 514 (CA 9 1978); Vencill v. Continental Cas. Co., 433 F.Supp. 1371 (S.D.W.Va.1977). See also cases discussed in Butler and Potter, *1349 The Primary Carrier Caught In The Middle With Bad Faith Exposure To Its Insured, Excess Carriers And Reinsurers, 24 Tort & Ins. L.J. 118 (1988); Smith, The Implied Covenant Of Good Faith And Fair Dealing As Affecting Equitable Subrogation, 1980 Ins. L.J. 378; Sutterfield, Relationships Between Excess And Primary Insurers: The Excess Judgment Problem, 52 Ins. Counsel J. 638 1985); Wall, Bad Faith, Excess Liability Actions By Or Against Excess Insurers, 48 Ins. Counsel J. 311 (1981); and Annot: Excess Carrier's Right to Maintain Action Against Primary Liability Insurers For Wrongful Failure To Settle Claims Against Insured, 10 A.L.R.4th 879.
In reviewing the allegations of the plaintiff's petition, which we must accept as true for purpose of the exception of no cause of action, we find that plaintiff has stated that the primary insurer acted in bad faith and breached the duty it owed to the insured to defend and settle the Youngblood suit against the insured, within the primary policy limits prior to trial, and that this breach caused damage to the insured. We further find that plaintiff has alleged that it is both legally and conventionally subrogated to the insured's claim against the defendants for their bad faith failure to defend and settle the Youngblood suit against the insured within the primary policy limits prior to trial. Plaintiff, under these pleadings, has set forth a right and cause of action against defendants. We find that the trial court was not manifestly in error or clearly wrong in overruling defendants' peremptory exceptions of no right of action and of no cause of action to plaintiff's petition.
For these reasons, we affirm the judgment of the trial court and recall the writ of certiorari previously issued and remand the case to the trial court for further proceedings. Costs of this appeal are taxed to defendants-relators.
JUDGMENT OF TRIAL COURT AFFIRMED; WRIT RECALLED AND CASE REMANDED FOR FURTHER PROCEEDINGS.
LABORDE, J., concurs in the result.
GUIDRY, J., dissents and assigns written reasons.
GUIDRY, Judge, dissenting.
I agree with my brethren of the majority that a primary carrier owes no direct legal duty to the excess carrier for either defense or settlement of a claim against a mutual insured. Laper v. Board of Com'rs., 523 So.2d 926 (La.App. 4 Cir. 1988), writ refused, 531 So.2d 275 (La. 1988). However, I disagree with their conclusion that plaintiff, Great Southwest, the excess insurer, has a cause of action to recover the amount it paid to Youngblood in excess of the primary coverage ($110,043.81) from the primary insurers, CNA Insurance Companies and Transportation Insurance Company, on the basis of subrogation, legal or conventional.
La.C.C. art. 1829 provides, in pertinent part, as follows:
"Subrogation takes place by operation of law:
* * * * * *
(3) In favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment; ..."
Under this provision, plaintiff is entitled to legal subrogation against the defendants (primary insurers) only if it can establish that it was bound with or for defendants and that it had an interest in discharging the debt which it now seeks to recover, i.e., the excess above the primary limits paid by defendants. See Aetna Insurance Company v. Naquin, 488 So.2d 950, at page 953 (La.1986); Elmwood Plantation, Inc., v. Ruud Water Heater Division, 815 F.2d 1016 (5th Cir.1987). Great Southwest was bound by contract with Contract Cleaners to pay the debt for which it seeks subrogation and thus clearly had an interest in discharging it. However, defendants, the primary insurers, were not obligated to Youngblood beyond the limits of their coverage and, therefore, when Great Southwest paid Youngblood the excess ($110,043.81), it did not pay a debt it owed with defendants or for defendants. Great *1350 Southwest, along with Contract Cleaners, was alone responsible for the discharge of that indebtedness and is not entitled to legal subrogation against the primary insurers.
By the same token, plaintiff is not entitled to conventional subrogation against defendants. As stated in Williams v. Feliciana Finance Co., Inc., 316 So.2d 833 (La. App. 1 Cir.1975), writ denied, 320 So.2d 913 (La.1975), "(t)he essence of subrogation is that the debt be paid for another, otherwise the payor would be the debtor and not a third party." (See La.C.C. Art. 1827). As aforestated, plaintiff did not pay a debt owed by others but rather its own debt and is thus not entitled to conventional subrogation.
Finally, I respectfully disagree with my distinguished brethren of the majority that no logical reason allows legal or conventional subrogation for personal injury and property damage claims, etc. but disallows legal or conventional subrogation to an excess insurer of a claim for a bad faith failure to defend or settle within the primary policy limit. The logical reason is that in the first instance the insurer is bound with the tort-feasor for the same debt and, when the insurer discharges that debt in favor of the victim (obligee), it becomes legally or conventionally subrogated to the victim's rights. In the latter case there is no subrogation because the excess insurer discharges its own debt for which the primary insurer is not responsible.
For these reasons, I would reverse the judgment of the trial court, sustain defendants' exception, and dismiss plaintiff's suit. I respectfully dissent.