HOWARD LIEBERMAN, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. EMPLOYERS INSURANCE OF WAUSAU, DEFENDANT–RESPONDENT AND CROSS–RESPONDENT, AND ROBERT MCDONOUGH, DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued May 5, 1980—Decided September 15, 1980.

328

*Leonard J. Felzenberg* argued the cause for appellant (*Felzenberg & Siegel*, attorneys; *Richard Feldman* on the brief).

*Leonard Rosenstein* argued the cause for respondent and cross–appellant (*Feuerstein, Sachs & Maitlin*, attorneys).

*James C. Orr* argued the cause for respondent (*Lum, Biunno & Tompkins*, attorneys; *Robert F. Priestley* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

The present appeal arises out of the settlement of a medical malpractice action which had been brought against plaintiff, a neurosurgeon, by a former patient for injuries allegedly resulting from a negligently–performed arteriogram. The neurosurgeon's professional liability insurer retained and assigned outside counsel to defend its insured against that medical malpractice claim. Contrary to the physician's express wishes, the liability insurer eventually settled the medical malpractice suit. As a consequence of that settlement, the annual premiums for the insured physician's malpractice insurance were increased substantially. The plaintiff subsequently instituted this present action against his professional liability insurer for breach of contract and against the attorney who had been retained to defend the medical malpractice claim for breach of duties owed to the physician arising from the attorney–client relationship.

## I

Plaintiff Howard Lieberman has been a licensed physician practicing neurological surgery in New Jersey since 1962. Together with another neurosurgeon, Frederick H. Ambrose, Lieberman has conducted his practice since 1970 in Elizabeth, New Jersey, as a professional corporation known as Elizabeth Neurosurgical Associates. Lieberman was also a staff member of several hospitals.

In early 1968, Lieberman obtained a short–term malpractice insurance policy with defendant Employers Insurance of Wausau (hereinafter Employers); this policy was renewed on November 1, 1968 and annually thereafter. With regard to the settlement of claims, these insurance policies read in pertinent part as follows:

[The insurer is empowered to] make such investigation and negotiation and, with the written consent of the insured, such settlement of any claim or suit as the company deems expedient. . . .

In the summer of 1968, while insured under the initial liability policy written by Employers, Lieberman performed an arterio-

gram [1] on Philip DeSarno. On September 8, 1970, DeSarno filed a medical malpractice action against Lieberman, Ambrose, and Elizabeth Neurosurgical Associates alleging that this arteriogram had caused him to lose the use of his hands. DeSarno sought $3,000,000 in damages. Lieberman then notified Employers, his liability insurer, about DeSarno's suit. On September 17, 1970, John B. Regazzi, an employee of Employers, assigned the defense of the DeSarno claim to Robert P. McDonough, an attorney licensed to practice law in New Jersey. McDonough then informed Lieberman and Ambrose that he was representing them in the DeSarno malpractice suit.

Under prevailing insurance practices, DeSarno's malpractice claim against Lieberman and Ambrose was later reviewed by the Union County Medical Society Committee, a county–based Medical Review Advisory Committee, in order to ascertain whether the claim was medically "non–defensible"; if it were, it would be deemed to be "chargeable" for purposes of imposing or increasing premium surcharges under the medical malpractice insurance surcharge program then in effect.[2] The committee found DeSarno's claim to be non–defensible and the suit accordingly became a chargeable claim against Lieberman under the surcharge program. Lieberman faced no immediate surcharge imposition, however, since the DeSarno claim was his only chargeable claim at that time and at least two such claims were required before a surcharge could be assessed under the program.

---

[1] An "X–ray picture of [an] artery after injection of [a] contrast medium into it." Stedman's Medical Dictionary 143 (21 ed. 1966).

[2] The surcharge program provided for the three–year imposition upon a "risky" insured physician of annual percentage premium surcharges. Under the plan, "[s]urcharges are developed by determining the number of chargeable losses [or claims] occurring within the applicable evaluation period." A "chargeable claim" is one wherein the case has a value in excess of $3,500[ ] at the time of an MRAC [county–based Medical Review and Advisory Committee] non–defensible decision. A settlement or verdict in excess of $3,500[ ] regardless of MRAC decision will also result in a chargeable claim.

Under the program, "[a]ll claims with a value in excess of $1,000[ ] must be submitted for MRAC review."

On June 4, 1971, Lieberman and Ambrose [3] met with a representative of Employers to discuss settlement possibilities with regard to the DeSarno suit. As a result of this meeting, Lieberman and Ambrose each signed identical settlement consent forms. Although McDonough never received copies of these signed consent forms, he did receive a memorandum from Employers confirming that the forms had been signed. Lieberman's signed consent form read in full as follows:

I, Howard Lieberman, M.D., hereby authorize Employers Insurance of Wausau, or their legal representative [blank] [ , ] to settle the claim of Philip DeSarno against me, within the limits of my policy with Employers Insurance.

After signing the settlement consent form, Lieberman received information indicating possible fraud or malingering on the part of DeSarno. Certain physicians had informed Lieberman that DeSarno had been using his hands normally. Lieberman communicated this information to Regazzi, who was responsible for the defense of the DeSarno claim at Employers. Regazzi in turn passed the information on to McDonough who then journeyed to the Mayo Clinic in Minnesota, where DeSarno had undergone treatment subsequent to the alleged malpractice. McDonough investigated the allegation of malingering and reported back to Employers but not to Lieberman. Employers concluded that the issues at trial would ultimately turn upon DeSarno's credibility and that proving fraud or malingering would, therefore, be almost impossible.

Lieberman asserts that he had orally informed Regazzi of the possible malingering and had expressed his view that a trial would be preferable to settlement under these circumstances. On January 26, 1973, Lieberman sent a certified letter to Regazzi referring to this conversation regarding DeSarno and again expressed his wish to proceed to trial on the medical malpractice claim.

---

[3]Although Ambrose was also sued by DeSarno and participated in the events which are here recounted, he is not now a party to the present litigation.

This certified letter to Regazzi, which purports to be Lieberman's revocation of the previously–granted consent to settlement, reads in its entirety as follows:

> In reference to our conversation, I should like to state that no settlement is to be made in the case of DeSarno vs. Lieberman, for any particular amount until said amount is agreed to by both Dr. Ambrose and myself.

A copy of this letter was shortly thereafter sent to McDonough's law firm.

Regazzi wrote to Lieberman on February 13, 1973 and rejected any attempt by the physician to revoke his consent to settlement negotiations. This letter read in pertinent part as follows:

> I acknowledge receipt of your Certified Mail letter. . . .
>
> Regretably [sic], based upon consents that were previously given, negotiations have been in progress prior to receipt of your letter and accordingly, must advise you we are unable to comply with your request.
>
> This situation is an extremely difficult one, and if a reasonable settlement can be entered into, it is advisable.

A copy of Regazzi's letter was also sent to McDonough.

In the brief interim between Lieberman's January 26 letter to Regazzi and Regazzi's reply letter to Lieberman, McDonough received a letter, dated January 31, 1973, from DeSarno's attorney in which DeSarno's counsel requested permission to negotiate any settlement directly with Employers. McDonough, who in fact had never previously negotiated with counsel on the DeSarno claim, acceded by telephone to that request. On March 9, 1973, Regazzi sent Lieberman another letter which noted that DeSarno's claimed damages of $3,000,000 were well in excess of Lieberman's liability coverage of $200,000 and suggested that it might be "desirable [for Lieberman] to consult [his] own personal attorney at [his] own expense so that [his personal attorney] can care for [Lieberman's] uninsured interests as they may appear."

McDonough had also been assigned by Employers to handle at least two other medical malpractice claims against Lieberman. In a typewritten note from McDonough to Lieberman dated November 2, 1973 regarding one of these other claims or cases, McDonough had appended a short, handwritten postscript which

stated that "[t]he DeSarno matter has been put off for a while." In fact, the case had been scheduled for trial eleven times, only to be adjourned each time.

Eventually, on February 1, 1974, the DeSarno case was called for trial and McDonough placed both Lieberman and Ambrose "on call" for that date. At an in–chambers pretrial settlement conference initiated by the trial judge, however, DeSarno's counsel offered a new, reduced settlement figure of $50,000. At that point, McDonough telephoned Regazzi with DeSarno's latest offer and was instructed by Regazzi to settle the claim then and there. McDonough followed Regazzi's instructions but did not communicate with Lieberman prior to executing this settlement. McDonough does claim, however, to have telephoned Lieberman's office immediately thereafter and to have transmitted news of the just–executed DeSarno settlement to Lieberman's secretary or receptionist. Lieberman denies ever having received any such message and instead contends that his initial knowledge of the DeSarno settlement came when he was assessed a premium surcharge on his professional liability policy at the time for renewal.

The DeSarno claim, upon settlement, became fixed as a chargeable claim under the surcharge program. Nevertheless, this claim alone could not have triggered the imposition of a premium surcharge because it was then Lieberman's first chargeable claim. With Lieberman's consent, however, two other malpractice claims against Lieberman had also been settled in 1974 in excess of $3,500 each. These two settlements in combination with the DeSarno claim resulted in the imposition of a 150% premium surcharge on Lieberman for three years beginning in November 1974.[4]

---

[4]At trial, the actual calculation and imposition of premium surcharges were described as follows:

> Under [the] Surcharge Program if a doctor was subject to two or more cases, he was subject to a surcharge. If he had two cases in a five–year period . . . [, cases] which were deemed chargeable, he was subject to a charge of an additional 50 percent of his regular [liability insurance] premium.

Lieberman instituted suit against Employers on October 2, 1975 seeking recovery of the surcharge premium. The gravamen of Lieberman's complaint was that Employers, by executing a settlement of the DeSarno claim without effective consent, had breached its contract of insurance with Lieberman. Lieberman subsequently filed an amended complaint joining McDonough as a defendant alleging McDonough independently breached the duties and obligations arising out of Lieberman's attorney–client relationship with McDonough. The recovery sought against McDonough was identical to that sought against Employers.

After the presentation of plaintiff Lieberman's case, both defendants moved for involuntary dismissal. The trial court held that while Lieberman had tried to revoke the settlement consent he had given to Employers, the insurer had relied on that consent and thus it was not required to accept any such attempted revocation thereof. Therefore, Employers' settlement of the DeSarno suit had been proper and involuntary dismissal was granted as to Employers. McDonough's similar motion, however, was denied because the court determined that there had existed an attorney–client relationship between Lieberman and McDonough. Following the presentation of McDonough's case, wherein it was conceded that an attorney–client relationship had existed between McDonough and Lieberman, the trial court found that McDonough had been aware that the physician did not want the case settled and that it thus had been improper for McDonough to settle the case. After further argument as to damages, the trial judge entered judgment against McDonough in the amount of $27,762, the amount of the surcharge premiums which at trial had been attributed to the settlement of the DeSarno claim, plus costs and prospective interest.

---

If he had three [chargeable] cases in a five–year period, he was subject to a surcharge of 150 percent for a three–year period of his regular premium[;] he paid [this surcharge] in addition to his regular premium.

The Appellate Division reversed the Law Division's judgment in favor of Employers and remanded that claim for trial. *Lieberman v. Employers Insurance of Wausau,* 171 *N.J.Super.* 39, 49 (App. Div. 1979). With respect to the claim against McDonough, the appellate court affirmed the finding of liability but reversed and remanded the claim for a new trial limited to a determination of damages. *Id.* at 53. Lieberman petitioned this Court for certification to the Appellate Division pursuant to *R.* 2:12–4 and McDonough cross–petitioned; Employers opposed both certification petitions. This Court granted certification of both the petition and cross–petition on January 14, 1980. 82 *N.J.* 284 (1980).

The questions presented by this appeal are as follows: (1) whether the insured's written consent to the settlement of a claim, a consent expressly required by the insurance policy, may be revoked or withdrawn by the insured prior to the execution of any settlement, (2) whether an attorney who is retained by the insurance carrier to represent the insured in defense of a claim can settle that claim upon instructions of the insurer, contrary to the wishes of the insured, and finally (3) what quantum of damages is the insured entitled to recover upon a determination of liability against the insurer and the attorney. We proceed to consider each of these issues.

## II

With respect to the initial question concerning the nature of Lieberman's consent to settle under the insurance policy, we find ourselves in substantial agreement with the views expressed by Judge Seidman for the Appellate Division in this case, *viz.:*

> [S]ince the insurer acts as the insured's agent in such matters [of settlement], and the extent of the insurer's authority, or limitation thereon, is derived from the insurance contract, the consent requirement clearly relates essentially to the exercise of that authority, and does not rise to the level of a specific contractual right to insist upon a trial. In the absence of a policy provision that the consent, once given, may not be withdrawn, or of proof that the insurer has acted upon such consent to its detriment, we discern no sound reason for holding the consent to be irrevocable . . . . [171 *N.J.Super.* at 48.]

█ Particularly with respect to the settlement of claims, this Court has stated emphatically that "the relationship of the [insurance] company to its insured regarding settlement is one of inherent fiduciary obligation." *Rova Farms Resort, Inc. v. Investors Ins. Co. of America*, 65 *N.J.* 474, 492 (1974). *Accord, LaRocca v. State Farm Mutual Automobile Ins. Co.*, 329 *F.Supp.* 163, 171 (W.D. Pa. 1971), aff'd o.b. 474 *F.*2d 1338 (3 Cir. 1973). While the insurer is not compelled to disregard its own interests in representing or defending an insured, the insured's interests must necessarily come first. See 7C J. Appleman, *Insurance Law and Practice* § 4687 at 191–192 (Berdal ed. 1979).

█ When the insurance contract calls for the consent of the insured as a condition for settlement but is silent as to the irrevocability of that consent, we must be guided in the interpretation of the insurance contract by the overriding fiduciary responsibilities of the insurer. In terms of whether the insured has the contractual right to revoke a consent once given, our interpretation of the insurance policy should be harmonized with the fundamental notion that the insurer acts as a fiduciary for the insured and must in good faith be responsive to the insured's interests. See *Traders & General Ins. Co., v. Rudco Oil & Gas Co.*, 129 *F.*2d 621, 626–627 (10 Cir. 1942); *Rova Farms Resort, Inc. v. Investors Ins. Co. of America, supra*, 65 *N.J.* at 497 ("Good faith has been construed to require the insurer to consider the interests of the insured as well as its own in deciding whether or not to settle the case within the limits of the policy."); Keeton, "Liability Insurance and Responsibility For Settlement," 67 *Harv. L. Rev.* 1136, 1137–1142 (1954); *cf. Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartford*, 72 *N.J.* 63, 70–71 (1976) (noting the continued existence of the rule requiring a showing of "bad faith" in refusal–to–settle actions).

█ In this case, it should be emphasized that the insurance contract contained no express provision that would either render the insured's consent to settlement irrevocable or prevent such a consent from being withdrawn once it has been given. The omission of such an express provision in a policy which explicitly

requires the insured's consent to settle creates at the very least an ambiguity as to the revocability of an insured's consent. That ambiguity is to be resolved in favor of the insured. See, e. g., *Bryan Construction Co. v. Employers Surplus Lines Ins. Co.*, 60 *N.J.* 375, 377 (1972); *Allen v. Metropolitan Life Ins. Co.*, 44 *N.J.* 294, 305 (1965).

■ We therefore hold that consent of the insured to authorize the insurer to effect a settlement is revocable in the absence of a contrary provision.

We do not mean to suggest that the contractual rights of the insured in this respect are either absolute or incapable of being abused. Thus, as noted by the Appellate Division here, there may be situations where it would plainly be unreasonable or in bad faith for the insured to withhold his consent or to attempt to withdraw it. 171 *N.J.Super.* at 48–49; see *Transit Casualty Co. v. Spink Corp.*, 94 *Cal.App.*3d 124, 132, 156 *Cal.Rptr.* 360, 365 (Ct. App. 1979). In this case, however, we are not presented with that issue. Further, the insurance company did not reasonably rely to its detriment upon Lieberman's consent since, prior to actual settlement and while the case was still capable of being tried, Employers was directly informed of Lieberman's refusal to settle and of the withdrawal of his earlier consent. Moreover, the record does not suggest that Lieberman's decision to revoke his earlier consent, a decision based upon evidence of the claimant's malingering, was itself unreasonable or made in bad faith.

■ Accordingly, we conclude that there has been neither a showing of reasonable detrimental reliance by Employers upon Lieberman's earlier consent nor any demonstration of unreasonableness or of bad faith on the part of Lieberman. Therefore, the revocation of his consent to settle the claim was effective. Employers' settlement of the claim despite this revocation constituted a breach of the consent provision of the insurance contract. As a result of this breach, the insurer has incurred liability to its insured.

### III

The question involving McDonough's liability to Lieberman for the unauthorized settlement implicates different issues. The ramifications of this triadic relationship—insurer, insured, and counsel—have recently been the subject of commentary. Mallen, "Insurance Counsel: The Fine Line Between Professional Responsibility and Malpractice," 45 *Ins. Counsel J.* 244 (1978); see R. Mallen & V. Levit, *Legal Malpractice* § 262 at 352–353 (1977); Germer & Tebbs, "Conduct of Defense Attorney and Insurance Company in Defending an Insured Where a Coverage Question is Involved," 13 *So. Texas L.J.* 223, 223–227 (1972); see also Corboy, "Defending Insurance Companies and the Insured—Can Two Masters Be Served?," 55(3) *Chi. B. Rec.* 102 (1973). In this setting, it has already been observed that "[i]nsurance defense counsel routinely and necessarily represent two clients: the insurer and the insured." Mallen, *supra*, 45 *Ins. Counsel J.* at 244. Nevertheless, "[t]he intrusion of the insurance contract does not alter the fact that the relationship with the insured is that of attorney and client." *Id.* at 245. "It cannot be overemphasized that the relationship is the same as if the attorney were hired and paid directly by the insured." Mallen & Levit, *supra*, § 262 at 353. See *Moritz v. Medical Protective Co.*, 428 *F.Supp.* 865, 871–872 (W.D. Wis. 1977).

In such a situation, "[d]efense counsel owes [the insured] the same unqualified loyalty as if he had been personally retained by the insured. The loyalty to the insured may actually [even] be paramount since that defense is the sole reason for the attorney's representation. There is no diminishment in the ethical obligations and standard of care applicable to insurance defense counsel." Mallen, *supra*, 45 *Ins. Counsel J.*, at 245 (footnotes omitted). See *ABA Formal Opinion* 282 (1950) ("The essential point of ethics involved is that the lawyer so employed shall represent the insured as his client with undivided fidelity. . . . "); N.J. Supreme Court Advisory Committee on Professional Ethics, *Opinion* 165, 92 *N.J.L.J.* 831 (1969); ABA "Guiding Principles" (approved Feb. 7, 1972) (ethical guidelines for liability insurers and their attorneys). Other jurisdictions have em-

braced this position as well. See, *e. g., Storm Drilling Co. v. Atlantic Richfield Corp.*, 386 *F.Supp.* 830, 831–832 (E.D. La. 1974); *American Mutual Liability Ins. Co. v. Superior Court*, 38 *Cal.App.*3d 579, 592, 113 *Cal.Rptr.* 561, 571 (Ct. App. 1974); *Brohawn v. Transamerica Ins. Co.*, 276 *Md.* 396, 410, 347 *A.*2d 842, 852 (Ct. App. 1975); *Hartford Fire Ins. Co. v. Masternak*, 55 *A.D.*2d 472, 474–476, 390 *N.Y.S.*2d 949, 952–953 (App. Div. 1977); *Transamerica Ins. Group v. Chubb & Son, Inc.*, 16 *Wash.App.* 247, 251, 554 *P.*2d 1080, 1083 (Ct. App. 1976). See also 19 *For the Defense (DRI)* 155 (1978) (Part 1), 19 *For the Defense (DRI)* 175 (1978) (Part 2) (a revised version of the above–cited Mallen article).

 While the insurer here did assign McDonough to the case and did pay his fee, it is nevertheless clear that there existed an attorney–client relationship between McDonough and the insured Lieberman. By ignoring the wishes of Lieberman–McDonough's client–to litigate the DeSarno matter rather than settle, McDonough thus breached the duty he owed to his client. This breach constituted actionable malpractice, thereby rendering McDonough liable for damages resulting therefrom. See, *e. g., Hoppe v. Ranzini*, 158 *N.J.Super.* 158, 164 (App. Div. 1978).

This explication was adopted by the Appellate Division, 171 *N.J.Super.* at 49–51, whose following language in this regard is particularly instructive:

> Plaintiff correctly argues that McDonough, as his attorney, undertook duties independent of his relationship with Employers. An attorney provided by an insurance company to represent an insured defendant owes that person the same unswerving allegiance that he would if he were retained and paid by the defendant himself. *Newcomb v. Meiss*, 263 *Minn.* 315, 116 *N.W.*2d 593, 598 (Sup.Ct.1962); *Jackson v. Trapier*, 42 *Misc.*2d 139, 247 *N.Y.S.*2d 315, 316 (Sup.Ct. 1964). While he owes to both a duty of good faith and due diligence in the discharge of his duties, the rights of one cannot be subordinated to those of the other. *Imperiali v. Pica*, 338 *Mass.* 494, 156 *N.E.*2d 44, 47 (Sup.Jud.Ct.1959). Consequently, whenever counsel in such case has reason to believe that the discharge of his duty to the insured would conflict with the discharge of his duty to the insurance carrier, he cannot continue to represent both. *Hammett v. McIntyre*, 114 *Cal.App.*2d 148, 249 *P.*2d 885 (D.Ct.App.1952); *Reynolds v. Maramorosch*, 208 *Misc.* 626, 144 *N.Y.S.*2d 900 (Sup.Ct.1955); *cf. Williams v. Bituminous Cas. Corp.*, 51 *N.J.* 146, 149 (1968); and see Keeton, "Liability Insurance and Responsibility for Settlement," 67 *Harv.L.Rev.* 1136, 1170 (1954). See also, *DR* 5–105(B), *Disciplinary Rules of the Code of Professional Responsibility.* [171 *N.J.Super.* at 49–50.]

Latent conflicting interests are always present as between an insured and an insurer. See Note, "Insurer's Liability for Refusal to Settle: Beyond Strict Liability," 50 *S.Cal.L.Rev.* 751, 762–765 (1977). Here, however, an actual conflict of interest arose as soon as Lieberman expressed his desire not to settle the DeSarno claim and Employers communicated to Lieberman its continued intention to settle if at all practicable. McDonough prior to the settlement was aware of this patent conflict of interests between his two "clients."

■ McDonough's proper course of action, though difficult, was clear. It was dictated by the paramount duty of singular loyalty and professional self–abnegation owed every client by an attorney. Where the insurer has refused to accede to the legitimate demand of the insured that the claim not be settled, McDonough, by continuing to represent Lieberman without informing him of the existence of this ethical dilemma, clearly violated his "duty to advise the client fully, frankly, and truthfully of all material and significant information." *In re Loring,* 73 *N.J.* 282, 290 (1977).

■ We conclude, therefore, that McDonough breached a duty owed to Lieberman inherent in their attorney–client relationship.[5] The attorney's professional dereliction here was two–fold. It first consisted of his failure to inform Lieberman of the clear conflict of interests and his subsequent failure either to withdraw from the case completely or to terminate his representation of either the insured or the insurer. It also consisted of McDonough's active participation thereafter in the actual settlement of the claim against the wishes of his client, the insured. This serious breach of duty constitutes actionable professional negligence or malpractice by the attorney.

---

[5]We need not decide whether liability for breach of the Employers' insurance contract may be imposed upon McDonough under agency principles because McDonough's breach of this attorney–client duty constitutes an independent ground for imposing liability.

## IV

In his complaint against Employers and McDonough, Lieberman sought damages both for injury to his reputation and for the liability premium surcharges for the policy years 1974–1976, as well as for costs. The trial judge, by granting involuntary dismissal as to Employers after the presentation of plaintiff's case, effectively denied recovery against Employers. The Appellate Division reversed this dismissal and remanded the case for a trial against Employers and for a new trial on damages against McDonough. 171 *N.J.Super.* at 49, 53.

"In fixing damages, the general problem of the law is, and should be, to put a plaintiff in as good a position as he would have been had the defendant kept his contract." *Giumarra v. Harrington Heights, Inc.*, 33 *N.J.Super.* 178, 196 (App.Div. 1954), aff'd o. b. 18 *N.J.* 548 (1955); *accord, 525 Main Street Corp. v. Eagle Roofing Co.*, 34 *N.J.* 251, 254 (1961); see also 5 *Corbin on Contracts* § 992 at 5 (1964); see generally Birmingham, "Breach of Contract, Damage Measures, and Economic Efficiency," 24 *Rutgers L.Rev.* 273 (1970). This principle would be applicable to Lieberman's claim against Employers. With respect to his claim against McDonough, Lieberman may recover for losses which are proximately caused by the attorney's negligence or malpractice. *RePass v. Vreeland*, 357 *F.*2d 801, 804 (3 Cir. 1966); *Hoppe v. Ranzini, supra*, 158 *N.J.Super.* at 164; *Passante v. Yormark*, 138 *N.J.Super.* 233, 238–239 (App.Div. 1975), certif. den. 70 *N.J.* 144 (1976). The burden of such a showing rests, of course, with the client asserting the malpractice. Houser, "Legal Malpractice–An Overview," 55 *N.Dakota L.Rev.* 185, 220 (1979).

In the instant case, if Employers had not breached the consent provision of the insurance contract–*i. e.*, if it had not settled the DeSarno claim–and if McDonough had not violated his duty to his client–*i. e.*, if he had not actually effected the settlement without Lieberman's permission–the DeSarno claim would presumably have gone to trial and would have been adjudicated or perhaps settled in the course of a trial. Under

the insurance surcharge program, however, a claim against an insured which exceeds $3,500, whether established by way of settlement or trial, would constitute a chargeable claim. Hence, for Lieberman to recover damages for these respective breaches, he must demonstrate actual injury as a result thereof. Lieberman would therefore be required to show in a trial for damages either (1) that he would have received in the DeSarno suit a verdict in his favor or a verdict against him for less than $3,500, or (2) that his insurer would have settled the claim for less than $3,500. In either of these events, no additional surcharge would have been imposed as a proximate result of the DeSarno claim, although Lieberman might still have been exposed to a lesser surcharge because of his other two chargeable settlements. *Ante* at 333. Unless able to prove one of these eventualities, plaintiff has suffered no damages in the nature of additional premiums as a proximate result of defendants' transgressions. Since the trial court did not determine damages in this manner, the Appellate Division was correct in remanding the case for a new trial on damages.

On retrial, Lieberman must show by a preponderance of the evidence what injuries he suffered as a proximate consequence of the respective contractual and professional breaches of Employers and McDonough. In proving what would have happened had the DeSarno claim been tried, Lieberman may proceed by offering the evidence which would have been submitted in the DeSarno suit. This procedure is generally followed in legal malpractice cases at least with respect to a legal malpractice claim based upon the failure of an attorney to bring a case to trial. See *Hoppe v. Ranzini, supra*, 158 *N.J.Super.* at 156. This procedure has been termed a "suit within a suit." *Ibid.*; Coggin, "Attorney Negligence . . A Suit Within a Suit," 60 *W.Va.L.Rev.* 225, 233 (1958).

In this case, the feasibility of the "suit within a suit" approach to the trial of plaintiff's damages claims has not been sufficiently explored. Several factors suggest that plaintiff should not be restricted to the more or less conventional mode of trying a "suit within a suit" to establish entitlement to damages. First, the

defendants, Employers and McDonough, are not both assertedly liable for professional malpractice. Lieberman proceeds against Employers on a breach of contract theory. Hence the procedural approach deemed appropriate for the trial of malpractice cases may not be suitable in this action.

Another factor to be considered is that in many malpractice actions the aggrieved plaintiff was a claimant or plaintiff in the original underlying action, the professional mishandling of which gives rise to the malpractice suit. In such cases, there well might be a parallel between the two actions as to the identity of witnesses and the nature of the evidence so that a later "suit within a suit" would not be inconvenient or difficult. In the instant case, however, there is, in effect, a reversal of roles. Lieberman is presently a plaintiff; in the original suit, he was a defendant. A requirement that he proceed in this malpractice action with direct proofs, as though he were the erstwhile claimant, would be awkward and impracticable. More important, such an attempted "suit within a suit" could well skew the proofs so that the present trial would not really mirror the earlier suit and thus a jury in the current case would not obtain an accurate evidential reflection or semblance of the original action, a facsimile which the "suit within a suit" approach is designed to present.

Finally, the passage of time itself can be a significant factor militating against the "suit within a suit" approach. Here, for example, the assertedly negligent arteriogram was performed in 1968; the witnesses in the DeSarno suit may no longer be available or their testimony and other evidence, if generally available, may not be susceptible of recapture in the same form or with the same effect as in the original action.

We conclude, therefore, that it should be within the discretion of the trial judge as to the manner in which the plaintiff may proceed to prove his claim for damages and that the appropriate procedure should, if not otherwise agreed upon between the parties, be settled through pretrial proceedings. We need not here delineate in final detail what alternatives must be considered except to observe that they include the "suit within a

suit" approach or any reasonable modification thereof. Another option, which may be apposite in this case in light of the duality of defendants, the factor of role reversal, and the passage of time, is to proceed through the use of expert testimony as to what as a matter of reasonable probability would have transpired at the original trial. *Cf. Shields v. Campbell*, 277 *Or.* 71, 76, 559 *P.*2d 1275, 1279 (Sup.Ct.1977) (in action for attorney malpractice, plaintiff introduces expert who testifies as to the effect malpractice had upon outcome of suit). Such experts would testify, in light of their experience and expertise, concerning the outcome of the DeSarno claim if the case had been brought to trial as anticipated by McDonough and had been defended in the manner McDonough had initially planned. *Cf. Rempfer v. Deerfield Packing Corp.*, 4 *N.J.* 135, 141–142 (1950) (where jury does not have sufficient knowledge with which to decide an issue, expert testimony is appropriate).

For the reasons expressed herein, the judgment of the Appellate Division is modified and affirmed as modified, and the matter remanded in accordance with this opinion.

SULLIVAN, J. (concurring in part and dissenting in part).

I agree that there should be a remand and retrial and I do not quarrel with the legal principles as to defendants' respective liabilities as set forth in the majority opinion. However, I would order a new trial as to all issues including liability and not hold, as the majority does, that defendants' liability to plaintiff had been established and that the issue on remand is damages only.

As defendant Robert McDonough argued in his Appellate Division brief, the credibility of plaintiff Dr. Lieberman is very much in question and the liability of defendants to Dr. Lieberman depends, to a substantial extent, on an assessment of that credibility.

Since the case is going back for retrial, I would order a retrial on all issues and not just the question of damages.

*For affirmance as modified*–Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, HANDLER and POLLOCK– 5.

*Concurring in part and dissenting in part*–Justice SULLI-VAN–1.