845 A.2d 602

KAREN GARCIA, PLAINTIFF–APPELLANT, v. KOZLOV, SEATON, ROMANINI & BROOKS, P.C., AND ELIZABETH L. SYLVESTER, ESQ., DEFENDANTS–RESPONDENTS, AND HERSH KOZLOV, ESQ., PHILIP B. SEATON, ESQ., DANTE J. ROMANINI, ESQ., GILBERT L. BROOKS, ESQ., AND FRANK A. DIGIACOMO, ESQ., DEFENDANTS.

Argued February 2, 2004—Decided April 13, 2004.

344

*Martin K. Indik,* argued the cause for appellant (*Indik & McNamara,* attorneys; *Mr. Indik and Steven K. Greene,* on the brief).

*Gilbert L. Brooks* argued the cause for respondents (*Wolf, Block, Schorr and Solis–Cohen,* attorneys).

Justice LONG delivered the opinion of the Court.

The issue before us arises out of a legal malpractice case. Plaintiff sued her former lawyers for failing to join an arguably integral party in a personal injury lawsuit. In the subsequent legal malpractice action, plaintiff claimed that she was forced to settle the personal injury case with the named defendants for less than full value as a result of the absence of the negligently omitted party. Because defendant raised the settlement first as a bar and then as a defense in the malpractice case, plaintiff sought to present her case, in part, through expert testimony. The trial court acceded to that request in reliance on *Lieberman v. Employers Insurance of Wausau*, 84 *N.J.* 325, 419 *A.*2d 417 (1980), wherein we signaled that the traditional "suit within a suit" format is not the only way to proceed in a legal malpractice action. Plaintiff obtained a verdict and defendant appealed.

The Appellate Division reversed, advocating strict adherence to the "suit within a suit" format in the absence of the precise factors considered in *Lieberman*. The Appellate Division misreads that case. In *Lieberman*, we specifically recognized that a legal malpractice case may proceed in any number of ways depending on the issues. Included among those options are a "suit within a suit," any "reasonable modification thereof," and a suit based on "expert testimony." *Lieberman, supra,* 84 *N.J.* at 343–44, 419 *A.*2d 417. The ruling in *Lieberman* did not establish a hierarchy among those approaches nor did it suggest that there is a presumption in favor of the "suit within a suit" scheme. We hold today that the proper approach in each case will depend upon the facts, the legal theories, the impediments to one or more modes of trial, and, where two or more approaches are legitimate, to plaintiff's preference. Courts are not to become involved in determining how a legal malpractice case is tried unless the parties disagree, in which case the final determination of the court is a discretionary judgment that is entitled to deference.

## I

Plaintiff, Karen Garcia, was injured in a multi-vehicle automobile accident on Route 130 in East Windsor, New Jersey on a rainy night in April 1992. The accident began with a collision between vehicles driven by Carol Ertel and Emily Forman. That accident cut power to the Forman car leaving it disabled and unlit in the roadway. Immediately following the crash, Ertel temporarily left the scene without taking steps to warn oncoming traffic about the Forman vehicle. Within minutes, another vehicle driven by Karen Marut struck the Forman vehicle. A chain-reaction crash followed in which a vehicle driven by Charlotte Ignall struck plaintiff's vehicle, which struck Marut's vehicle.

On November 1, 1993, the law firm of Kozlov, Seaton, Romanini & Brooks, filed a complaint prepared by its associate, Elizabeth Sylvester, Esq., on behalf of plaintiff against Forman, Marut, and Ignall for negligence. The complaint inexplicably omitted Ertel. The law firm then discovered a conflict of interest with an insurance company implicated in the case and referred the matter to Michael Gentlesk, Esq., who was then retained by plaintiff. Gentlesk moved to amend the complaint to include a claim against Ertel. After the court granted the motion, Ertel successfully moved for summary judgment based on the applicable statute of limitations. Plaintiff later settled her claims against the other drivers for $87,000. Thereafter, she filed a complaint for malpractice against the Kozlov firm and Sylvester (collectively, defendant) alleging that defendant's negligence in failing to name Ertel caused her to settle her case for less than its true value.

The trial of plaintiff's legal malpractice claim began on July 31, 2000. After jury selection, the trial court was presented with motions *in limine* from both parties. Plaintiff argued for the right to proffer expert testimony regarding the settlement in addition to direct evidence regarding her case. Defendant countered, among other things, that the matter should instead be tried solely as a "suit within a suit," that plaintiff should be precluded from presenting evidence indicating that she had not come to a

stop prior to the first impact,[1] that Gentlesk should be barred from testifying, and that the settlement in the underlying case should operate as a bar to the legal malpractice action.

The court granted plaintiff's motion and denied that of defendant stating:

I think that because of the shifting positions by the plaintiff it will be necessary for the plaintiff [ ] to utilize and the defendants to utilize or may utilize if they wish expert testimony in presenting their case. This does not relieve the plaintiff of their obligation to prove the underlying case, but the case can be presented by the use of expert testimony.

The next issue concerning the net opinion of Mr. Gentlesk and his evaluation of the case at the time of settlement that would be admissible for a limited purpose, that is to show the reasonableness of the settlement that he entered into. The proof of the actual value of the case must come from the witness herself together with any expert testimony [that] [s]he finds.

As to point 3, the barring of the plaintiff from presenting evidence—any evidence indicating she failed to stop prior to the first impact, that is a misapplication of the doctrine. She is estopped from changing her testimony. Her legal position in this case may, of course, change.

The plaintiff, of course, will be permitted to testify to the extent of her present medical condition. I take it that there's no issue as to the time limits of or to the notice of those reports offered by her experts that you've received them within time.

. . . .

[Mr. Gentlesk's] testimony, of course, is admissible. It goes to the reasons for the strategy that he adopted and his evaluation of the case and the way it was presented. That certainly is relevant and that is admissible.

. . . .

And, of course, the settlement of the prior case doesn't bar her from proceeding in this case.

Plaintiff's case began with evidence of the underlying accident. In deposition testimony, Emily Forman recalled her collision with Ertel:

---

[1] The point of that application was defendant's apparent view that if plaintiff had fully stopped before striking the Forman/Marut wreck, Ertel's negligence could not have proximately caused plaintiff's injuries in precipitating the original accident.

I was driving northbound on route 130, it was after sunset. I don't remember the exact time, maybe 8:00. It was dark out and a little bit rainy so the road was slick. I was in the left hand northbound lane driving about 45 to 50 miles per hour and a car pulled out in front of me. It was a matter of yards. I don't know exactly—the exact distance. I slammed on the brakes but I still struck the rear of the car. Then my car was stopped in the left hand lane, so I tried to turn on the hazard lights and they wouldn't go on. So I got out of the car and stepped onto the median. There was a grassy median that divides the north and southbound lanes. The—and the passenger who was with me we agreed he would try to turn the lights on. So while he was trying to turn on the lights we didn't have any interior lights or headlights or flasher hazard lights. While he was doing that I was on the grassy median and I didn't know what to do other than to try and warn the cars that were coming. So I started to walk southbound on the median. At that point no cars were coming and I saw, let me think about how far away that was, about a quarter of a mile south of where my car was there was a traffic light. I don't know if a quarter of a mile is really a good judgment of distance, but that's my best estimation.

. . . .

And the light, I could see the light was red and it was turning green, so I knew that a wave of traffic would be coming. So I started to run up the median waiving my arms and trying to warn the cars from hitting my car that they couldn't see. But it didn't work because a car smashed into my car and then another car and then another car, and that's very blurry. I don't remember any specific—specifics about that, what the color of the cars were, what car hit what, which way they spun. I was just sort of trying not to get hit by a flying car. I think that's about it.

In response to being asked about the number of cars in the pile-up, Forman responded: "It was a total of five. The car that I hit and then three cars that hit me, one, two, three, four, five, yes." Meanwhile, according to Forman, Ertel "pulled over to the right hand shoulder and then sometime during when all the cars had hit my car and glided and spun around she drove away."

Plaintiff testified to her own recollection of the accident. She recalled seeing something dark in the roadway in front of her. That was apparently the Marut/Forman accident scene. She was not sure whether she came to a full stop before hitting Marut, although she believed, whether stopped or not, she was close enough to Marut that a person could not walk between the two cars. When Ignall hit her, she ended up "sandwiched" between Ignall and Marut. On cross-examination, plaintiff acknowledged that she had stated on several occasions, including depositions,

that she stopped short of the car in front of her before she was hit. Ignall's deposition testimony indicated that she struck plaintiff's car.

Plaintiff testified that as a result of the accident, she could not walk and was taken by ambulance to the hospital. She stated that she cut her tongue, chipped her tooth, and suffered serious knee injuries. According to plaintiff, she underwent two surgeries on her knee, along with a repair of the tooth. She detailed her lengthy and painful rehabilitation and her residual chronic headaches and neck pain, for which she received epidural injections and medication. In addition, she recounted that she could no longer engage in any sustained activities without resting. For example, she could no longer sit or walk for any period of time or ride on a motorcycle and missed a significant amount of work.

Three witnesses testified regarding plaintiff's medical condition. Dr. Carl Moble, an orthopedic surgeon, performed the second knee surgery because her patella femoral joint (knee cap) was dislocating. Moble testified that functionally, a person with such an injury would have swelling, difficulty walking, tenderness, "and most important the normal gliding motion of the knee joint which is a hinge that rotates mechanically speaking is interrupted so that the knee cap dislocates out of the groove on the femur." Moble determined that plaintiff required "open" knee surgery for the "transfer of a muscle group to reinforce the normal positioning of the knee cap in the patella femoral groove." According to Moble, that is a very invasive procedure in which there is a surgical incision into the patient's knee, large enough to expose the muscles outside the kneecap. After such a procedure, Moble testified, major rehabilitation is required, including bracing and exercise lasting over six months.

Dr. J. Willard–Mack, a clinical neuropsychologist, stated that plaintiff was suffering from an adjustment disorder related to the pain resulting from the accident.[2] Plaintiff's symptoms were

---

[2] An adjustment disorder is any "of a class of disorders that result from an individual's failure to adapt to identifiable stresses in the environment such as

persistent depression and anxiety, and fear of driving. He also described transient post-traumatic stress disorder-like nightmares and flashbacks that plaintiff had experienced, which by the time of trial, had mostly resolved. Willard–Mack stated that plaintiff was also suffering from chronic pain disorder.[3]

Finally, Dr. Ira Klemons, a dentist whose practice is limited to headaches and facial pain, testified to plaintiff's diagnosis and treatment for a Temporomandibular Joint Dysfunction.[4] The temporomandibular joint (TMJ) is the joint "in front of the ear that allows a person to speak and chew normally, smile and have facial expressions normally." After examining plaintiff, reviewing her extensive records, and administering objective tests as well as hearing the subjective accounts of her injuries and symptoms, Dr. Klemons found plaintiff to have

> suffered numerous injuries to a wide array of muscles, ligaments, tendons and joints in the head, face, neck and shoulders. The temporomandibular joint does not function by itself. It interrelates with numerous structures in what's referred to as the upper quarter, head, face, neck and shoulders. And, so, our evaluation includes all of [ ] the related areas and her injuries, her base line injuries to those structures has by way of summary.

Treatment of plaintiff's TMJ included the insertion of a device to change the position of her lower jaw. Another device was inserted to increase blood flow through the arteries that pass through the joint into other parts of the head and to reduce

---

divorce, natural disaster, family discord, or retirement, characterized by an impaired ability to function socially or occupationally." *The American Heritage Stedmans's Medical Dictionary* 19 (1995).

3 According to Willard–Mack, a pain disorder is "a situation where you had a pain syndrome ongoing for more than six months in which the individual is experiencing pain on a chronic basis."

4 A Temporomandibular Joint Dysfunction is an "impaired functioning of the temporomandibular articulation of the jaw." *The American Heritage Stedmans's Medical Dictionary* 822 (1995). Temporomandibular Joint Syndrome, also abbreviated as TMJ, is a "disorder that is caused by faulty articulation of the temporomandibular joint and is characterized by facial pain, headache, ringing ears, dizziness, and stiffness of the neck." *Ibid.*

spasm. That device uses electronic stimulation to force the muscles to contract and relax very quickly. In addition, ultrasound was used to stimulate blood flow to the joints and muscles. If those approaches do not work, various injections may be used along with surgery. Klemons stated that the injections and surgery would be an option for plaintiff if her pain did not subside with the present treatment.

Klemons also testified that plaintiff's condition is permanent and that plaintiff's future function and lifestyle would be affected negatively in a series of ways, "things that we all do in our lives normally."

> She can't eat large foods. She can't eat hard foods, she can't eat chewy foods, steak, apples, carrots, things that everybody takes quite—it's the normal part of life. She has to avoid. She shouldn't open her mouth wide and singing, yelling or other—or even speaking a great deal can make this come back. Anything involving a forward head posture, typing, gardening, painting a house or a room even in many cases reading can be problematic. Now, obviously she can't avoid every single thing I've just said nor the others that are like that but she will have to limit it as best she can. She can't lift, she can't push, she can't pull anything over about 20 pounds or so without risking recurrence and worse.

James Messner, plaintiff's fiancé, testified regarding her injuries and their effect on her life. Messner stated that plaintiff is in constant pain because of her headaches, and stays in bed all day, immobilized with a brace on her neck and an appliance in her mouth due to her headaches. Messner indicated that plaintiff could no longer do housework or participate in avocational activities that they had engaged in together in the past including fishing and motorcycling. Further, Messner testified that plaintiff could no longer drive a car due to her anxiety.

Regarding the settlement, plaintiff testified to her conversations with Gentlesk, the negotiations with the accident defendants, and her reasons for settling the claim. She testified that Gentlesk told her the value of her case was between $200,000–$250,000 and that she should take the settlement offered, basically because the absence of Ertel was a problem to full recovery. According to plaintiff, Gentlesk told her Ertel was at fault for the accident and that she should settle with the remaining defendants and sue the law firm.

She also testified that another partner at defendant's firm, Frank DiGiacomo, told her to take the settlement because "some money is better than no money at all." Plaintiff stated that she would not have taken the settlement in full satisfaction of all of her claims if it were not for the reservation of the right to bring the malpractice action.

Gentlesk testified that he estimated the "full value" of plaintiff's claim to be at or around $200,000, although he acknowledged that he could have said $250,000 to her.[5] When the defendants in the underlying suits made settlement offers totaling $87,000 ($65,000 from Ignall, $10,000 from Marut, $12,000 from Forman), Gentlesk recalled that in each instance "[m]y recommendation was that it was a settlement that she should consider accepting." His advice reflected the absence of Ertel as a defendant because of the "leverage" it afforded the defendants at trial. Gentlesk testified that "[t]he defendants that remained in the case indicated to me that their defense would be that Ertel caused the first accident," and consequently, bore primary responsibility for plaintiff's injuries. He further acknowledged that due to the fact that the police report recounted the statement of an eyewitness who claimed to have seen plaintiff hit Marut prior to being hit by Ignall, the potential of plaintiff's own comparative negligence relative to the named defendants influenced his thinking. In other words, absent Ertel, all other parties were, to Gentlesk, similarly situated. When asked whether he would have recommended a settlement of $87,000 if Ertel had been a defendant in the case, Gentlesk responded, "[p]robably not."

Plaintiff also presented the testimony of a malpractice expert, Douglas Calhoun, Esq., who weighed in on two aspects of her claim. First, Calhoun expressed his opinion that defendant deviated from the standard of care when it failed to sue Ertel within

---

[5] By the time of trial, Gentlesk was employed at defendant's firm and plaintiff's lawyer was permitted to inquire into the effect of that employment on his recollections. DiGiacomo denied ever having recommended settlement.

the statute of limitations. Second, he testified regarding the effect of defendant's negligence on the underlying suit. Calhoun described the mechanism of New Jersey's comparative negligence statute and how, in combination with the omission of Ertel from the underlying action, it hampered plaintiff's ability to recover full compensation for her injuries.[6] It was his view that, absent Ertel, plaintiff could not fairly argue that she was less negligent than the other defendants. Calhoun also explained how the omission of Ertel handicapped plaintiff by affording the accident defendants an "empty chair" defense.

During his testimony, Calhoun estimated the liability of Ertel at "a minimum of fifty if not sixty percent." That estimate, along with Gentlesk's testimony regarding the potential full value of plaintiff's underlying claims, and the litigation risks generated by the omission of Ertel, led Calhoun to assert that plaintiff acted reasonably in settling her case for $87,000.

The trial court ultimately ruled that because Calhoun reviewed nothing but the police reports and the pleadings to familiarize himself with the accident, although the depositions of all parties involved were available, his

testimony in so far as he sought to articulate a percentage of responsibility toward the [Ertel] vehicle has been stricken. That will be a matter for [the jury] to decide based upon the other evidence that has been presented in this case and will be presented in this case. The remaining opinions that [Calhoun] offered concerning responsibility that is a deviation from standard of practice by the lawyers remains in the case, and [the jury is] free to consider that in [its] verdict in this case.

Plaintiff does not challenge that ruling.

Defendant also produced expert testimony. Timothy Barnes, Esq., expressed the opinion that the defendant's failure to include

---

[6] At the time of the trial, *N.J.S.A.* 2A:15–5.3 stated that only a defendant determined to be 60% or more responsible for damages would be liable for the total amount of the award. A defendant found to be more than 20% but less than 60% liable would be responsible for the total amount of any economic loss but only that percentage of the noneconomic loss directly attributable to his negligence. A defendant found to be 20% or less responsible for the damages would be liable only for the percentage of the award directly attributable to his negligence.

Ertel in the suit was not malpractice because plaintiff's deposition testimony showed that she had come to a full stop prior to colliding with the Marut vehicle. According to Barnes, that placed primary responsibility for the accident on Ignall, who hit plaintiff. Therefore, because Ertel's negligence was not a proximate cause of plaintiff's injuries, Barnes opined it would not have been ethical to name Ertel as a defendant. Thus, Barnes concluded that the $87,000 plaintiff received was a reasonable settlement of her case with the only liable defendants, given her own negligence for failing to activate her hazard lights or pull off to the right.

Additionally, the defense read portions of Ertel's deposition testimony into evidence. Ertel stated that prior to making the left turn, she looked to her right and did not see any vehicles approaching; that after pulling into the left lane, she looked into her rearview mirror and saw a vehicle approaching her "fast"; and, that she did not hear any screeching brakes prior to the impact that pushed her car forward.

The police reports also were admitted into evidence by consent. They contained the statements of all of the drivers regarding the happening of the accidents, the statement of an eyewitness, and full diagrams of the scene. Those statements and diagrams indicated that Ertel made a left hand turn into traffic and that she left the scene and did not return for an hour.

At the close of the presentation of evidence, the trial court decided the issue of negligence in favor of plaintiff as a matter of law. The court found

> that after examining the record and the testimony of Mr. Barnes that he did not articulate a reason for finding no negligence. In fact, [ ] part of his reason was contrary to accepted New Jersey law, that is that the [ ] initial car, the Ertel car could [not] be a contributing cause to the happening of the accident and for that reason among others I found that his opinion in that regard was basically a net opinion and his testimony concerning ethical considerations was just really to muddle the record. There was nothing in the record to suggest that any one would have had any ethical breach by bringing suit against the Ertel vehicle.

In addition, the court ruled that plaintiff acted reasonably in settling the underlying case against the party defendants. Those rulings are not challenged here.

After complete instructions regarding the considerations relevant to assessing responsibility for the accident and to valuing plaintiff's injuries, the trial court put two questions to the jury for consideration. The first was whether defendant was a proximate cause of plaintiff's loss. The second asked for "the reasonable settlement value" of plaintiff's claim in November of 1996. The jury responded affirmatively to the first question and set the reasonable settlement value of plaintiff's claim at $225,000. Based on those findings, the court molded the verdict and awarded plaintiff $92,460 in actual damages plus pre-judgment interest.[7]

Defendant appealed, arguing, among other things, that the traditional "suit within a suit" method of trying a legal malpractice case was violated. The Appellate Division reversed, addressing only that issue. The court "[was] satisfied that in a complex matter such as this, there was no sound basis to depart from the 'suit within a suit' format," which it apparently viewed as presumptive. Accordingly, it held that the trial court erroneously exercised its discretion when it granted plaintiff's application to try the case in hybrid fashion.

In ruling, the Appellate Division accepted as a given that defendant was negligent when it failed to name Ertel in the underlying suit and that the "suit within a suit" format was not necessary in order to prove that legal malpractice took place. Further, the Appellate Division acknowledged that *Lieberman* left the decision regarding the mode of trial of a legal malpractice claim within the "sound discretion of the trial court." Despite those findings, the panel concluded that the trial court abused that discretion. Because of the conflicting factual versions of the accident and because Ertel's liability was pivotal, the panel viewed the "suit within a suit" model as the proper tool to resolve the case. In reaching that conclusion, the court concluded that there

---

[7] The verdict for $225,000 was reduced by the $87,000 already received and the $45,540 in counsel fees arising out of the first case.

were no factors, within the meaning of *Lieberman,* compelling divergence from the "suit within a suit" scheme.

Having determined to reverse, the Appellate Division turned its attention to the question of whether to remand for a new trial. The court ruled: "Plaintiff adopted a certain litigation strategy. That it proved incorrect does not entitle her to a new trial with a different strategy." Accordingly, the court concluded that the doctrine of invited error compelled a reversal without a remand. We granted plaintiff's petition for certification, 176 *N.J.* 280, 822 *A.*2d 609 (2003), and now reverse.

## II

Plaintiff attacks the Appellate Division decision on two fronts. She argues that under *Lieberman,* the trial court was within its discretion in admitting expert testimony on damages inflicted by defendant's malpractice, and that in any event, the decision of the Appellate Division reflects a misapplication of the doctrine of invited error and produced an unjust result.

Defendant counters, on the merits, that the Appellate Division correctly ruled that departure from the "suit within a suit" format was not warranted under *Lieberman* and reasserts the invited error doctrine as a ground to justify the denial of a retrial.

## III

Legal malpractice is a variation on the tort of negligence. *McGrogan v. Till,* 167 *N.J.* 414, 425, 771 *A.*2d 1187 (2001). Thus, a plaintiff must prove a deviation from the standard, proximate causation, and damages. *Ibid.* (citing *Conklin v. Hannoch Weisman,* 145 *N.J.* 395, 416, 678 *A.*2d 1060 (1996)). There is no question in this case regarding the threshold issue of whether defendant committed professional negligence. Indeed, that issue, on which the trial court directed a verdict, is not contested on this appeal. What is at issue here is whether defendant's failure to

sue Ertel proximately caused plaintiff to be damaged and if so, in what amount.

■ Where, as here, the claim of malpractice alleges a failure to meet a time-bar, "a client must establish 'the recovery which the client would have obtained if malpractice had not occurred.'" *Frazier v. New Jersey Mfrs. Ins. Co.*, 142 *N.J.* 590, 601, 667 *A.*2d 670 (1995) (quoting *Osborne v. O'Reilly*, 267 *N.J.Super.* 329, 331, 631 *A.*2d 577 (Law Div.1993)); *see also Gautam v. De Luca*, 215 *N.J.Super.* 388, 397, 521 *A.*2d 1343 ("[T]he measure of damages is ordinarily the amount that the client would have received but for his attorney's negligence."), *certif. denied,* 109 *N.J.* 39, 532 *A.*2d 1107 (1987).

■ The most common way to prove the harm inflicted by such malpractice is to proceed by way of a "suit within a suit" in which a plaintiff presents the evidence that would have been submitted at a trial had no malpractice occurred. The "suit within a suit" approach aims to clarify what would have taken place but for the attorney's malpractice. *Gautam, supra,* 215 *N.J.Super.* at 397, 521 *A.*2d 1343. At such a trial, "plaintiff has the burden of proving by a preponderance of the evidence that (1) he would have recovered a judgment in the action against the main defendant, (2) the amount of that judgment, and (3) the degree of collectibility of such judgment." *Hoppe v. Ranzini,* 158 *N.J.Super.* 158, 165, 385 *A.*2d 913 (App.Div.1978).

The "suit within a suit" format is regularly employed in most jurisdictions, including New Jersey. R. Mallen & V. Levit, *Legal Malpractice,* § 33.8, vol. 5, at 69 (5th ed.2000); *Lieberman, supra,* 84 *N.J.* at 342, 419 *A.*2d 417. Yet, it has been subjected to criticism.

First, the rule wholly ignores the possibility of settlement. The simple fact is that many, if not most, legal claims are not tried to conclusion, but rather are amicably adjusted. Second, it is often difficult for the parties to present an accurate evidential reflection or semblance of the original action. Finally, the passage of time itself can be a significant factor militating against the "suit within a suit" approach.

[*Gautam, supra,* 215 *N.J.Super.* at 398, 521 *A.*2d 1343.]

Further, in some situations, a "suit within a suit" cannot accurately reconstruct the underlying action. *See Developments in the Law—Lawyers' Responsibilities and Lawyers' Responses,* 107 *Harv. L.Rev.* 1557, 1568–69 (1994) (discussing complications of reconstructing original lawsuit); Polly A. Lord, Comment, *Loss of Chance in Legal Malpractice,* 61 *Wash. L.Rev.* 1479 (1986) (same). Often, parties must cope with the disadvantage of not having the same access to evidence or of having evidence grow stale with the passage of time. Paul Gary Kerkorian, Comment, *Negligent Spoliation of Evidence: Skirting the "Suit Within a Suit" Requirement of Legal Malpractice Actions,* 41 *Hastings L.J.* 1077 (1990). Evidentiary concerns loom large for underlying suits that never reach trial. *Developments, supra,* 107 *Harv. L. Rev.* at 1569.

The "suit within a suit" format has also drawn fire for being unfair to plaintiffs who must litigate the underlying claim against the lawyer who originally prepared it. John Leubsdorf, *Legal Malpractice and Professional Responsibility,* 48 *Rutgers L.Rev.* 101, 148 (1995). Courts and commentators alike acknowledge the various ways in which the "suit within a suit" method can distort the underlying action. *See Thomas v. Bethea,* 351 *Md.* 513, 718 *A.*2d 1187 (1998) (detailing criticisms of "suit within a suit" approach). Such shortcomings have created the need for alternative approaches and a measure of willingness to accept such alternatives when the situation demands.

It was in responding to that need that we decided *Lieberman.* There, a malpractice case was filed against a physician, Lieberman. The physician's insurance carrier arranged for counsel to defend the action. In the course of pretrial preparations, the physician received a tip raising a suspicion about the genuineness of the plaintiff's injuries. He related the details both to the insurance carrier and counsel and expressed an unwillingness to settle. Counsel investigated the possible fraud and reported back to the insurance carrier. Over Doctor Lieberman's objections, the carrier instructed counsel to accept a settlement offer of $50,000.

Because it was the third medical malpractice claim against the doctor resolved for an amount in excess of $3,500, the settlement triggered a three-year 150% premium surcharge under his malpractice policy. Subsequently, the doctor sued the insurance carrier and counsel for settling against his wishes. He asserted damages in the amount of the surcharge that he would not have had to pay if the medical malpractice suit went to trial and the jury found him liable for less than $3,500. *Lieberman, supra,* 84 *N.J.* at 334, 419 *A.*2d 417.

The trial court entered judgment against the attorney, who then appealed. The Appellate Division reversed and remanded. We affirmed and modified, addressing whether the "suit within a suit" formula was compelled. With respect to the facts, we observed:

Several factors suggest that plaintiff [Dr. Lieberman] should not be restricted to the more or less conventional mode of trying a "suit within a suit" to establish entitlement to damages. First, the defendants, Employers and McDonough, are not both assertedly liable for professional malpractice. Lieberman proceeds against Employers on a breach of contract theory. Hence the procedural approach deemed appropriate for the trial of malpractice cases may not be suitable in this action.

Another factor to be considered is that in many malpractice actions the aggrieved plaintiff was a claimant or plaintiff in the original underlying action, the professional mishandling of which gives rise to the malpractice suit. In such cases, there well might be a parallel between the two actions as to the identity of witnesses and the nature of the evidence so that a later "suit within a suit" would not be inconvenient or difficult. In the instant case, however, there is, in effect, a reversal of roles. Lieberman is presently a plaintiff; in the original suit, he was a defendant. A requirement that he proceed in this malpractice action with direct proofs, as though he were the erstwhile claimant, would be awkward and impracticable. More important, such an attempted "suit within a suit" could well skew the proofs so that the present trial would not really mirror the earlier suit and thus a jury in the current case would not obtain an accurate evidential reflection or semblance of the original action, a facsimile which the "suit within a suit" approach is designed to present.

Finally, the passage of time itself can be a significant factor militating against the "suit within a suit" approach. Here, for example, the assertedly negligent arteriogram was performed in 1968; the witnesses in the DeSarno suit may no longer be available or their testimony and other evidence, if generally available, may not be susceptible of recapture in the same form or with the same effect as in the original action.

[*Id.* at 342–43, 419 *A.*2d 417.]

In terms of procedure, we stated, "it should be within the discretion of the trial judge as to the manner in which the plaintiff may proceed to prove his claim for damages and that the appropriate procedure should, if not otherwise agreed upon between the parties, be settled through pretrial proceedings." *Id.* at 343, 419 *A.*2d 417. By way of example, but not of limitation, we detailed some possible approaches, including:

[T]he "suit within a suit" approach or any reasonable modification thereof. Another option, which may be apposite in this case in light of the duality of defendants, the factor of role reversal, and the passage of time, is to proceed through the use of expert testimony as to what as a matter of reasonable probability would have transpired at the original trial. *Cf. Shields v. Campbell*, 277 *Or.* 71, 559 *P.*2d 1275, 1279 (1977) (in action for attorney malpractice, plaintiff introduces expert who testifies as to the effect malpractice had upon outcome of suit). Such experts would testify, in light of their experience and expertise, concerning the outcome of the DeSarno claim if the case had been brought to trial as anticipated by McDonough and had been defended in the manner McDonough had initially planned. *Cf. Rempfer v. Deerfield Packing Corp.*, 4 *N.J.* 135, 141–142, 72 *A.*2d 204 (1950) (where jury does not have sufficient knowledge with which to decide an issue, expert testimony is appropriate).

[*Id.* at 343–44, 419 *A.*2d 417.]

What is important about *Lieberman* is the flexibility it accorded to lawyers and judges to limn an appropriate procedure in each case based on the facts and on the claims, without favoring one approach over another. Indeed, as Justice Handler observed in *Lieberman*, the court need not even become involved unless the parties have a disagreement over the course that the trial will take. In the absence of a disagreement requiring court intervention, a plaintiff is free, as in any case, to approach the trial as he or she sees fit, so long as the Rules of Court and Rules of Evidence are satisfied. Where the matter is presented to the court because the defendant interposes a legal objection to the plaintiff's proposed trial strategy, it is within the court's discretion to declare an appropriate trial model. That is the backdrop for our inquiry.

## IV

■ We turn now to the facts of this case. In our view, the trial court was empowered fully to allow this case to proceed as it

did. As in nearly all malpractice cases, plaintiff needed to produce an expert regarding deviation from the appropriate standard. *Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, P.C. v. Ezekwo*, 345 *N.J.Super.* 1, 12, 783 *A.*2d 246 (App.Div. 2001). Calhoun served that purpose. (Obviously, that is not the kind of expert testimony we addressed in *Lieberman.*) Ordinarily, a "suit within a suit" would follow.

What complicated matters was defendant's position that plaintiff willingly and reasonably accepted $87,000 as the full value of the case. That leg of the case required Gentlesk to testify, as a fact witness, why in the absence of Ertel, he recommended that plaintiff settle with the remaining defendants for $87,000, although he considered the case to be worth much more. Plaintiff likewise had to explain why she agreed to do so. An expert was proffered to show how Ertel's absence negatively affected plaintiff's litigation and settlement posture in 1996 and why the settlement with the named defendants was a reasonable strategy under the then-existing circumstances. Again, Calhoun provided that evidence. It is important to note, however, that Calhoun's testimony was not presented as a substitute for the jury's evaluation of the case, but only to explain the reason for the settlement.

In addition, as our detailed recitation of what transpired at trial reveals, plaintiff presented a full "suit within a suit" by adducing all of the circumstances surrounding the accident, along with factual and expert testimony regarding the damages she sustained. That evidence provided the jury with an independent basis to determine the effect of Ertel's absence from the case and to value plaintiff's losses.

Thus, the issues addressed in *Lieberman* are not really at play in this case. *Lieberman* suggested the possibility of expert testimony substituting for a "suit within a suit." That is not what occurred here. In this case, a full "suit within a suit," providing evidence to support the jury verdict, was produced. The expert testimony was not offered as a substitute for that evidence, but as

an adjunct to address a different issue—the effect of the earlier settlement.

Hence, the Appellate Division erred, not only in too narrowly interpreting *Lieberman* as a theoretical matter, but in failing to recognize that a "suit within a suit," providing the jury with a basis for its determination, in fact took place. That is not to suggest that this was a perfect trial, only that the single error identified by the Appellate Division did not occur. Therefore, because neither error nor invited error is implicated, we reverse the judgment of the Appellate Division to the contrary.

Because the Appellate Division based its opinion on the single issue to which we have adverted, it did not reach the remaining questions raised by defendant. Included, among other issues, are defendant's claims involving the sufficiency of the evidence regarding proximate cause; the lack of expert testimony on the settlement value of plaintiff's claims; the lack of evidence regarding the original defendants' willingness to settle for more than $87,000; the inadmissibility of evidence regarding plaintiff's post-settlement condition and treatment; the impropriety of plaintiff's questioning of Gentlesk regarding bias; and, the erroneous computation of prejudgment interest. Because those issues remain outstanding, we remand the case to the Appellate Division for disposition. Our remand should not be taken as an indication of our view on the merits of any of those claims.

## V

The judgment of the Appellate Division is reversed. The case is remanded for further proceedings consistent with this opinion.

*For reversal and remandment*—CHIEF JUSTICE PORITZ and JUSTICES LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—7.

*Opposed*—None.